# EXHIBIT B

Westlaw.

Slip Copy

Page 1

2005 WL 1176565 (3rd Cir.(Pa.))

(Cite as: 2005 WL 1176565 (3rd Cir.(Pa.)))

**H**

**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Troy TUCKER, Appellant,
v.
MERCK & CO, INC.
**No. 04-3023.**

Submitted Under Third Circuit LAR 34.1(a) April 19, 2005.
Decided May 19, 2005.

On Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C. No. 03-cv-05015). District Judge: Honorable James T. Giles.

Robert T. Vance, Jr., Philadelphia, PA, for Appellant.

Judith E. Harris, Bacardi L. Jackson, Morgan, Lewis & Bockius, Philadelphia, PA, for Merck & Co, Inc.

Before ROTH, FUENTES and BECKER, Circuit Judges.

OPINION

BECKER, Circuit Judge.

*1 Troy Tucker sued Merck, his employer, under 42 U.S.C. § 1981, claiming numerous instances of disparate-treatment racial discrimination, in addition to a claim that he was subjected to a racially hostile work environment. The District Court for the Eastern District of Pennsylvania found that Tucker had not made out a prima facie case of race discrimination or a hostile work environment, and granted summary judgment to Merck. Tucker now appeals, and we affirm.

I

Tucker's § 1981 employment discrimination claim is analyzed under the same framework as sexual discrimination claims under Title VII of the Civil Rights Act of 1964. *Schurr v. Resorts Int'l Hotel Inc..,* 196 F.3d 486, 499 (3d Cir.1999). This framework was set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this test, the plaintiff bears the responsibility of making a prima facie case of discrimination. This is done by showing (1) that he is a member of a protected class, (2) that he was subject to an adverse employment action, and (3) that similarly situated members of other racial classes were treated more favorably.

An adverse employment action has been defined by the Supreme Court:
 A tangible employment action constitutes a significant change in employment status, such as hiring, firing failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.... A tangible employment action in most cases inflicts direct economic harm.
*Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 761-62, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Our Court has defined an "adverse

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2005 WL 1176565 (3rd Cir.(Pa.))

**(Cite as: 2005 WL 1176565 (3rd Cir.(Pa.)))**

Page 2

employment action" under Title VII as "an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." ' *Storey v. Burns Int'l Sec. Servs.,* 390 F.3d 760, 764 (3d Cir.2004) (quoting *Cardenas v. Massey,* 269 F.3d 251, 263 (3d Cir.2001); and *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir.1997)).

We have jurisdiction pursuant to 28 U.S.C. §§ 1291, 1331 & 1343.

II

Tucker, who is African-American, alleges that a number of decisions taken by Merck constituted adverse employment actions.

A

Merck has a policy of providing educational assistance to its employees. The policy allows employees to get tuition money for degree and non-degree courses that are relevant to their current work at Merck, or to other Merck jobs for which management thinks they might be qualified. Eligibility is at the discretion of management.

In May 2002, Tucker requested assistance to attend computer network certification courses. Tucker's supervisor denied the request because the courses did not relate to Tucker's current position at Merck, or to a potential future position for him. Tucker then asked for assistance to attend a Pharmaceutical MBA program. This request was approved. Because the course included classes during work hours, Tucker's supervisor asked Tucker to sign an "Alternative Work Arrangement" ("AWA") document drafted by a human resources employee. Tucker refused. Merck nonetheless continued to pay for his Pharmaceutical MBA.

*2 In the summer of 2003, Tucker requested approval to obtain a nursing degree. This request was approved, but his supervisors informed Tucker that he could only receive assistance for one program at a time. Tucker had never planned to do both programs at a time; he was going to "put the MBA on hold in order to fulfill the [nursing] program." (App.139.) He then did exactly that. No other Merck employee ever seems to have been approved for educational assistance to pursue two degree programs at the same time.

Tucker claims that the AWA and the refusal to fund both the MBA and the nursing degree at the same time are adverse employment actions. We disagree. Neither cost Tucker anything--he never signed the AWA (and even if he had it would not have been an adverse action), and he never had any plans to pursue both degrees at the same time. The denial of funding for the network certificate also was not an adverse employment decision, as it was not a significant change in employment status or a "significant change in benefits." No negative action was taken; Tucker was simply denied a discretionary benefit worth some $2,197. The MBA courses that he eventually took instead cost Merck some $3,855, more than the cost of his original request. Even if the denial of funding was an adverse action, however, Tucker has not made out a prima facie case of discrimination. Tucker's supervisors were following Merck's stated policy, and Tucker has not even alleged that any members of other racial groups were treated more favorably.

B

Tucker went on short-term disability leave on September 17, 2002, allegedly due to stress caused by a hostile work environment. His doctor submitted documentation on October 4, which his Merck disability case manager determined was insufficient. On October 25, 2002, more than a month after Tucker went on disability, he received a letter noting the lack of documentation and demanding that Tucker's doctor and therapist provide documentation that day in order to avoid termination. Tucker's medical professionals did so, and he did not come back to work. He was not terminated.

In November 2002, Tucker's disability case manager learned that Tucker was attending his classes while still on disability leave. Concerned that this might indicate fraud, she contacted Tucker's therapist, who told her that this was consistent with his disability. The case manager, who had never met Tucker, took no further action.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 3
2005 WL 1176565 (3rd Cir.(Pa.))

**(Cite as: 2005 WL 1176565 (3rd Cir.(Pa.)))**

Tucker remained on short-term disability for about four and a half months, returning to work on February 3, 2003. He received all the disability benefits that he claimed during this time.

Tucker claims that these incidents show an intent to discriminate against him. None of them are even arguably adverse employment actions, however, and he has provided no evidence that anyone else was treated more favorably. Therefore, he has not made out a prima facie case of a § 1981 violation.

C

Merck allows employees to take paid leave days without using vacation time. Four types of paid personal absence are typically allowed: death in the immediate family, care for a sick relative, medical or dental appointments, and "[l]egal or civic obligations," such as "closing on a house, jury duty, etc.," that are "unable to be arranged during non-working times." (App.414.) The employee's immediate supervisor determines whether to grant a personal day. There is no maximum, but supervisors are advised to limit use of personal days. On average, Merck employees take four or five personal days each year.

*3 Tucker took seventeen personal days in 2003. In part, this was because of a lawsuit that he and his wife had previously filed against Merck, alleging defamation and invasion of privacy in connection with Merck's decision to terminate Tucker's wife. *See Tucker v. Merck & Co., Inc.,* 102 Fed. Appx. 247 (3d Cir.2004) (not precedential opinion) (affirming summary judgment against the Tuckers). Tucker requested paid personal days to attend his own deposition, and those of other witnesses in that case. Tucker's supervisor granted Tucker a personal day for his own deposition, but not for the others. Similarly, when he filed the instant suit, Tucker requested seven or eight personal days to attend depositions. Merck again granted him a personal day to attend his own deposition, but not others. Tucker attended all of the depositions, taking vacation days when he was denied personal days.

Tucker's supervisor testified that he generally did not require a reason for an employee to take a personal day, but he did require reasons of Tucker, who had taken an unusual number of personal days. (App.182.) Indeed, Tucker apparently took five personal days in his first month back from work after medical leave (App.31), and missed a total of nine and a half of his first nineteen days back from disability leave (App.25). At some point in summer or fall 2003, after taking 17 personal days, Tucker was told that he would not be granted any more paid personal days in 2003 for any reason, and that he would need to take vacation or unpaid time to attend to any more personal matters.

Tucker claims disparate treatment, pointing out that seven other employees in his division accumulated more than five personal days in 2003, and none were subjected to similar monitoring. Merck replies that none of those seven employees took more than 8.5 personal days, and argues that they were thus not similarly situated. We agree with Merck: Tucker was allowed *twice* as many personal days as any other employee in his division, and therefore cannot point to anyone, of any racial group, who was treated more favorably than he was. Moreover, several cases hold that requiring an employee to take a vacation day rather than a personal day does not constitute an adverse employment action. *See Cantrell v. Jay R. Smith Mfg. Co.,* 248 F.Supp.2d 1126, 1138 n. 29 (M.D.Ala.2003); *Montgomery v. City of Birmingham,* No. 98-AR-2100-S, 2000 WL 1608620, *7 (N.D.Ala. Jan.20, 2000). At least in this case, such a requirement is not "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment," especially given that Tucker was in fact allowed seventeen personal days.

D

Tucker's 2002 and 2003 employment evaluations were unsatisfactory: Tucker was in the bottom half of his group in 2002, and was the lowest ranked analyst in 2003. Tucker alleges that these evaluations were unfair and motivated by racism.

Tucker points to the fact that his supervisor, Timothy Lynch, kept notes of his interactions with Tucker, which he did not do with any other analyst. Tucker considers this evidence of Lynch's racism,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 4
2005 WL 1176565 (3rd Cir.(Pa.))
**(Cite as: 2005 WL 1176565 (3rd Cir.(Pa.)))**

which he thinks tainted his evaluations. Lynch testified that he took the notes because he "was aware that Troy was involved with litigation with the company and I felt a bit threatened by him. I felt like I needed to keep some records to protect myself." (App.185.) Tucker was suing Merck at the time, and had also sent various letters to Merck officers alleging racial discrimination. Lynch's explanation is perfectly reasonable, and Tucker offers no reason to think that Lynch's notes were made for any purpose but to protect himself from a litigious employee.

*4 It is also far from clear that these evaluations constituted adverse employment actions. The District Court found that they did not, noting that Tucker received raises of over $5,000 in each of those years; that he received bonuses of $2,088 in 2002 and $1,356 in 2003; and that Tucker presented no evidence that these amounts were different either from what white contract analysts got or from what Tucker got prior to his 2002 evaluation. (App.32.) There is thus no evidence that the negative evaluations had any impact on Tucker's compensation or terms of employment. A negative evaluation, by itself, is not an adverse employment action. *See Weston v. Pennsylvania,* 251 F.3d 420, 431 (3d Cir.2001). Indeed, even a negative evaluation that leads to a lower than expected merit wage increase or bonus probably does not constitute an adverse employment action. *See Rabinovitz v. Pena,* 89 F.3d 482, 488-489 (7th Cir.1996); *EEOC v. Wyeth Pharmaceutical,* No. Civ. A. 03-2967, 2004 WL 503417, *2 n. 3 (E.D.Pa.2004).

Even if the evaluations were adverse employment actions, Tucker presented no evidence that anyone similarly situated had been treated more favorably. As Merck puts it, "[a]ll that Mr. Tucker offers in support of his claim is his belief that his ratings should have been higher." Merck has offered detailed descriptions of how the evaluations were created and justified. [FN1] Here, again, Tucker has failed to present a prima facie case.

> FN1. The evaluations contain specific criticisms of Tucker's timeliness, responsiveness, thoroughness, and depth of knowledge. Lynch found numerous errors in his spreadsheets and criticized him for taking a passive and minor role in various projects. Lynch also noted that Tucker was often late for work, not at his desk, reading school textbooks during work hours, or actually asleep at his desk. (App.388-408.)

E

In December 2002, Tucker sent a memorandum to various Merck executive officers alleging racial discrimination and demanding an investigation. This letter was referred to Michael Cavalier, a Senior Director of Human Resources, who wrote to Tucker to tell him that he would handle the investigation. Cavalier also told Tucker that he should address his correspondence about the investigation only to Cavalier. Tucker continued to address correspondence to Merck executive officers; Cavalier warned him that this could result in discipline, although Tucker was never actually disciplined. Tucker argues that the requirement that he address his concerns to Cavalier, not the executives, violated Merck's "Open Door Policy" (which "encouraged employees to bring their concerns directly to management"). Tucker provides little support for this argument, and at all events such a violation would not constitute an adverse employment action.

Cavalier's inquiry found no evidence of racial discrimination. Tucker alleges that the investigation was insufficient, but he has not pointed to any evidence of discrimination that Cavalier missed or undervalued. Even if Tucker were right, however, that Cavalier's investigation was inadequate, he does not explain how that could constitute an adverse employment action. We think it cannot.

III

In addition to his disparate-treatment claims, Tucker alleges that the incidents discussed above created a hostile work environment. We have explained the hostile environment cause of action as follows:

*5 To bring an actionable claim for [racial] harassment because of an intimidating and offensive work environment, a plaintiff must

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 5
2005 WL 1176565 (3rd Cir.(Pa.))
**(Cite as: 2005 WL 1176565 (3rd Cir.(Pa.)))**

establish "by the totality of the circumstances, the existence of a hostile or abusive working *environment* which is severe enough to affect the psychological stability of a minority employee." We hold that five constituents must converge to bring a successful claim for a ... hostile work environment under [§ 1981]:(1) the employees suffered intentional discrimination because of their [race]; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same [race] in that position; and (5) the existence of respondeat superior liability.
*Andrews v. City of Phila.,* 895 F.2d 1469, 1482 (3d Cir.1990) (citation omitted).

Tucker alleges that the facts outlined above constituted pervasive and regular discrimination, which occurred regularly since June 2002 and which caused him stress and anxiety. He alleges no facts other than those set forth above; in particular, he does not allege that anyone ever said or did anything overtly racist to or about him.

The District Court reviewed the caselaw and determined that Tucker had no evidence to support a hostile work environment claim. Isolated incidents of racial harassment will not create such a claim. *See, e.g., Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 482 (3d Cir.1997). We find the District Court's conclusions here persuasive:
> In his hostile work environment claim, plaintiff cannot cite a single incident involving the utterance of a racial epithet, the use of a racist symbol, or *any* direct comment concerning race. Rather, plaintiff raises eight separate incidents where Merck made determinations regarding benefits issues raised by him. These incidents were each employment decisions or actions not linked directly with conduct regarding race. As discussed earlier, plaintiff failed to establish a prima facie case of intentional discrimination for each of the decisions. He has no direct evidence of discrimination and points to no similarly situated individual treated more favorably. Plaintiff's subjective disagreement with these decisions, and even his opinion that they were racially motivated and were offensive, is insufficient as a matter of law to establish a hostile work environment.

(App.35.) Tucker has not produced any evidence that any decision ever taken by Merck was racially motivated; indeed, several of the actions he complains of were taken by Merck employees who had never met Tucker and were unaware of his race. Tucker cannot contend that the benefits decisions he complains about constituted harassment, intimidation, or hostility. Thus he has not made a prima facie case of hostile-work-environment discrimination.

The judgment of the District Court will be affirmed.

2005 WL 1176565 (3rd Cir.(Pa.))

**Briefs and Other Related Documents (Back to top)**

- 04-3023 (Docket)
    (Jul. 19, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.