Paragraph 9 of the Complaint alleges that almost immediately after being hired[14] she began "to bring to attention of STSD and Mr. Huber various incidents of non-compliance with the IDEA." In support of this assertion, Plaintiff cites to Exhibit 1, an October 22, 2001 memorandum to Steve Huber, the Vice Principal and Supervisor of Special Education at the High School. A review of Exhibit 1, however, establishes that the memo: 1) suggests ways to streamline internal operating procedures; 2) responds to a question regarding eligibility determination criteria; and 3) suggests additional topics for discussion at bi-monthly special education meetings. The contents of the memorandum do not amount to "protected activity" under the IDEA.

It was the plaintiff's job to evaluate students for eligibility. Making suggestions regarding streamlining procedures for the job the plaintiff is supposed to perform does not evidence an opposition[15] to illegal activity, nor does the memorandum specifically identify any illegal activity. The memorandum, moreover, is general in nature and does not refer to any student who would qualify as disabled. Even if the memorandum referred to procedural violations, any such violations would not, as a matter of law, result in the loss of an educational opportunity or deprive a student of educational benefits. As such, even if the memorandum could be viewed as opposition to an illegal activity, the plaintiff could not have had an objectively reasonable belief that the memorandum amounted to protected activity. Under no set of circumstances could the memorandum in ¶ 9 be viewed as protected activity. The Court, therefore, should dismiss any allegations of retaliation under the RA based upon Exhibit 1 of the plaintiff's Complaint.

---

[14] The plaintiff was hired by the School Board on October 8, 2001.
[15] The ADA's retaliation provisions to refer to individuals *opposing* unlawful activity. *See* 42 U.S.C. § 12203(a).

The allegations in ¶¶ 10 and 11 of the Complaint do not assert protected activity or adverse employment action.  Rather, these allegations establish that despite Ms. Houlihan's suggesting procedural changes, she was *promoted* to the position of Special Education Coordinator, a position which she later voluntarily resigned.  The memorandum referred to as Exhibit 2 does not detail protected activity as it merely refers to conflict between two staff members.  Conflicts between Ms. Houlihan and staff members were not uncommon during her tenure as the coordinator and these conflicts continued after she resigned her position as coordinator.  *See* Aug. 2, 2003 Performance Appriasal (Cmplt. Exh. 7); Cmplt. Exh. 6 (referring to unprofessional behavior and negative staff interactions).

While the memorandum refers to possible legal repercussions in the event of a due process action, this bald, unsupported assertion does not, in fact, allege a violation.  Moreover, the deficiencies noted are merely alleged procedural errors which the plaintiff could not reasonably believe would result in a substantive deprivation of education benefits to a student.  Moreover, there is no assertion that these procedural deficiencies resulted in a deprivation of education benefits to a student.  Personnel disputes do not give rise to retaliation claims under the RA.  *Cf. Gray*, 957 F.2d at 1083 (indicating that civil rights lawsuits cannot be transformed into a forum for everyday workplace disputes).

In paragraph 12, the plaintiff contends that she was "removed" from the coordinator position.  The plaintiff, however, admitted in ¶ 11 that she asked to be relieved of the position due to staff conflicts. Having Ms. Walls-Culotta[16] become her

---

[16] Ms. Walls-Culotta's name is misspelled in the caption of the Complaint.

DOCS_DE 110446v1

supervisor, moreover, cannot be viewed as an adverse action, as employers must be permitted to make routine employment decisions without fear of lawsuits. The allegations in ¶ 12 do not establish any of the elements of a retaliation claim and, therefore, should be stricken.

Paragraph 13 is stated in conclusory terms and cannot be responded to because the allegation fails to set forth dates on which the incidents occurred or the people involved. The allegation also fails to identify the procedures alleged to be missing. Even if the activities alleged were, however, protected activity, being accused of dragging out meetings and being unfocused does not amount to adverse action. *Weston*, 251 F.3d at 430 (indicating that oral reprimands are not actionable). Moreover, internal operating procedures regarding the length of meetings are matters which cannot, as a matter of law, give rise to a retaliation lawsuit under the RA as employers must not be inhibited from making ordinary managerial decisions. Paragraphs 13-17 suffer from similar deficiencies as they do not contain dates or identify individuals, they refer to routine operating procedures at the school, and the only adverse action alleged are oral reprimands.

Paragraph 18 also fails to assert either protected activity or actionable adverse employment action. The gist of this paragraph is that the plaintiff was instructed that instead of reporting incidents of suspected violations to the coordinator or the suspected violator, she should report them to the principal, who was supervising the plaintiff at the time. In light of the difficulties that the plaintiff was having communicating with staff at the time, this change was neither unusual nor retaliatory.

Being required to report suspected violations to the principal, who was ultimately responsible for IDEA compliance, and who was also acting as the plaintiff's supervisor at

the time cannot as a matter of law be deemed adverse action. Moreover, the plaintiff does not allege that the action was adverse. Rather, she contends that the reason the change was made was to permit Ms. Walls-Cultotta and Mr. Huber to decide what action to take and to look like they knew what they were doing. Allegations such as this do not support a retaliation claim. Rather, they support the proposition that the plaintiff is an unhappy employee with a chip on her shoulder who did not feel that she was appreciated. Civil rights statutes are not intended to provide relief from disagreements about day to day business decisions. Paragraph 18 fails to state a claim of retaliation.

In paragraph 19 of the Complaint, the plaintiff acknowledges her growing resentment based upon having to report suspected technical violations to Ms. Walls-Culotta. She also identifies a number of e-mails, Cmplt. Exh. 3, wherein she purportedly reports suspected violations of the IDEA.

In the plaintiff's January 12, 2004 e-mail, she identifies several potential "violations:"

1) The dismissal of the IEP team prior to the completion of the IEP;

2) The signing of a 10 day waiver to correct the omission of "IEP development" being included on the IEP meeting invitation rather than having the parents initial the original invitation indicting their approval that the IEP be developed at the meeting;

3) Her desire to have certain eligibility determination meetings (EDM) reclassified to IEP's;[17] and

4) Permission test forms being mailed out indicating there would be informal assessment without the IEP team addressing the issue.

There is no indication in these allegations who the students involved were or that the students that the students were disabled or qualified for services. Moreover, there is

---

[17] This is the same issue addressed in the second e-mail included with Exhibit 3.

-18-

no claim that the dismissal of the team prior to completion of the meeting or having certain EDM meetings reclassified resulted in the student's being deprived of an educational opportunity. Even if the plaintiff asserted a deprivation, bare allegations of a deprivation will not suffice. *C.M.*, 2005 WL 899927 at *2.

Having EDM's occur prior to IEP's, moreover, cannot be viewed as depriving a student of an educational opportunity because students are not entitled to IEP's unless and until they are deemed eligible.[18] As such, this allegation does not refer to protected activity, as it cannot be viewed as opposing what the plaintiff reasonably believed were violations amounting to a student's being deprived of an educational opportunity.

Plaintiff's complaint about the waiver being signed clearly refers to a minor technical issue which would not, as a matter of law, deprive a student of an educational opportunity or the student's parent's an opportunity to participate. The parents, moreover, obviously signed the waiver. This complaint cannot be viewed as protected activity as the plaintiff could not have reasonably believed that this was anything other than a minor procedural violation, which would not deprive the plaintiff of an educational opportunity.

As for the plaintiff's complaint about permission test forms being mailed out indicating that informal assessment would occur without being addressed by the IEP team, this allegation does not identify students and, therefore, the plaintiff cannot establish protected activity because the plaintiff has failed to identify a disabled student. Moreover, the plaintiff is raising a procedural issue without identifying any specific

---

[18] *See* 34 C.F.R. § 300.531 (requiring an initial evaluation prior to the provision of services).

IDEA provision that was violated.[19] Rather, the plaintiff is simply stating her belief as to a better system. Disputes over internal procedures do not give rise to civil rights retaliation claims. Even if the plaintiff could establish an IDEA violation based upon how the notices were sent out, it is well settled that disputes over minor procedural issues do not amount to protected activity as the plaintiff could not reasonably have believed that checking off informal assessment would deprive students of an educational opportunity. *See C.M.*, 2005 WL 899927 at *2 (stating that technical violations or procedural inadequacies which do not cause a substantive deprivation of educational benefits are not actionable).

With respect to the handwritten note on the bottom of the January 12, 2004 e-mail included with Exhibit 3, the plaintiff indicates that she complained about invitations being mailed out without indicating all of the purposes being addressed at meetings. The note goes on to say that the plaintiff wanted the form changed to indicate that the IEP would also be done, "if [the child] qualifies." Consistent with her past allegations, the plaintiff fails to identify a specific section of the IDEA that was violated and, instead, is simply attempting to impose her view of "best practices" for compliance. This complaint

---

[19] In fact, despite plaintiff's bald assertion of a violation, 34 C.F.R. § 300.505, and Del. Dept. of Ed. Reg. 925, § 3.1 *require* parental consent before conducting an initial evaluation.

Throughout her history with the school district plaintiff identified alleged "violations." She could not, however, substantiate these allegations by pointing to specific requirements in the law. Plaintiff's complaints typically referred to suggestions on different ways to do things. Differences of opinion over procedural issues do not implicate civil rights laws. To the extent that the Court believes that any of plaintiff's allegations of "violations" might otherwise have merit, the Court should require the plaintiff to specifically identify where in the law, by reference to specific code requirements, the alleged procedure violates the IDEA. Absent support in the law, the plaintiff could not have reasonably believed that any of her alleged violations were, in fact, violations.

-20-

again refers to minor disagreements over procedural issues which the plaintiff could not reasonable believe resulted in a serious deprivation of parental rights or the deprivation of an educational opportunity for the student. This complaint, therefore, does not qualify as "protected activity" which will support a retaliation claim.

Although the note implies that Ms. Walls-Culotta adopted the suggestion and changed the form, this does not establish that there was a violation of the IDEA. Absent specific identification of an IDEA requirement violated, the change is evidence of nothing more than acquiescence in a request to change a procedure. Bald assertions regarding violations do not support retaliation claims.

The remaining allegations in ¶ 19 suggest that the plaintiff was disgruntled because her "expertise" with respect to the IDEA was being questioned by her superiors. Again, she refers to unsubstantiated and unidentified "violations" of the IDEA without offering any citation to the Code. In support of the allegation that her superiors did not blindly adopt her suggestions, the plaintiff refers to Exhibit 4 of the Complaint. The first memorandum in Exhibit 4, dated January 20, 2004, establishes that Ms. Walls-Culotta reviewed the plaintiff's concerns over the collection of data and disagreed with the plaintiff's interpretation with respect to one issue, and contacted the school's attorney to confirm compliance. The memorandum discusses a disagreement over a procedural issue. There is no indication that any particular student was deprived of an educational opportunity or that any student's IEP was not reasonably calculated to provide meaningful educational benefits to the child. The plaintiff, therefore, could not reasonably have believed that her suggestion was "protected activity" under the civil rights statutes. In addition, absent the identification of a disabled student, the plaintiff's

complaint with respect to this issue fails to state a claim because she does not have standing to assert the rights of all students with respect to generalized grievances.

The second memorandum from January 20, 2004 discusses the plaintiff's suggestion about identifying data needed for triennial reevaluations in the IEP meeting prior to the reevaluation and agreed to set up a meeting to discuss the proposal. This issue clearly refers to an in-house procedural issue, suggesting a way to improve the data collection process, not a violation of the IDEA. This memorandum does not involve protected activity within the meaning of the IDEA and, therefore, cannot form the basis of a retaliation claim.

The second memorandum also refers to concerns the plaintiff expressed about procedures at IEP meetings related to reviewing a student's progress. There is no indication that these "concerns" implicate a violation of the IDEA and, moreover, other than a bald assertion regarding an IDEA violation, no IDEA violation has been established. The concerns, moreover, address procedural issues and there is no suggestion that any particular student was deprived of an educational opportunity as a result of the procedures used. The plaintiff, therefore, has failed to establish that she engaged in protected activity. As such, she cannot maintain a retaliation claim based upon the "concerns" identified in this memorandum. Moreover, the plaintiff lacks standing to assert generalized grievances.

The final item in Exhibit 4, an e-mail from Plaintiff dated February 23, 2004, refers to questions and a disagreement over internal operating procedures related to who should sign requests for permission to test students. Once again, this complaint addresses nothing more than internal operating procedures and does not implicate any violation of

the IDEA. Indeed, this e-mail offers further evidence of the plaintiff's continued inability to cooperate with staff members on even routine tasks. Because this e-mail does not refer to protected activity, it cannot support a claim of retaliation. As such, it should be stricken from the Complaint.

In ¶¶ 20-21, the plaintiff alleges that she complained to STSD Board member Charles Mitchell about issues of IDEA non-compliance. For the reasons set forth above, there was no reasonable basis for the plaintiff to believe that there were violations and, therefore, any complaint to Mr. Mitchell about unfounded allegations cannot be considered protected activity. Moreover, the plaintiff's concerns were not directed to a particular student and the plaintiff does not have standing to address generalized grievances related to non-compliance. In addition, the plaintiff failed to identify any students who were actually deprived of an educational opportunity.

In support of her contention that after she spoke to Mr. Mitchell she continued to raise concerns about IDEA violations, the plaintiff refers to three e-mails. *See* Cmplt. Exh. 5. The first e-mail, dated February 27, 2004, addresses solely an internal issue with respect to the number of IEP's scheduled by the department secretary and the fact that some may need to be rescheduled because all of the paperwork may not be completed. This issue refers to internal office procedures, not violations of the IDEA, and cannot be viewed as "protected activity."

The second part of the e-mail acknowledges that teachers are complying with the plaintiff's suggestion that re-evaluation needs be addressed earlier. This merely anecdotal report is not a complaint in opposition to any procedures. The e-mail, moreover, is addressed to the department secretary, who is not a party to this litigation

-23-

and who had no control over any decisions by the defendants to terminate the plaintiff. This e-mail fails to refer to protected activity in any manner and, therefore, cannot support a retaliation claim. Thus, the e-mail should be stricken from the Complaint.

The second e-mail in Exhibit 5, dated March 2, 2004, went from the plaintiff to Defendant Huber. This e-mail does not address violations of the IDEA. Rather, it requests clarification of internal operating procedures and asks for a meeting to discuss these procedures. This e-mail does not identify any violations of the IDEA and does not address protected activity. As such, this e-mail cannot support a retaliation claim.[20]

The final e-mail in Exhibit 5 is dated March 12, 2004. This is actually a chain of e-mails discussing what testing the Division of Vocational Rehabilitation (DVR) requires with respect to students transitioning out of high school. The e-mail does not address or even assert a violation of the IDEA. The e-mail, moreover, is a discussion of proper procedures, and properly solicited the plaintiff's input. This e-mail does not evidence any statements in opposition to STSD procedures allegedly violating the IDEA. This e-mail, therefore, does not involve protected activity and the plaintiff could not reasonable believe that it did. This e-mail, therefore, cannot support a retaliation claim.

Paragraph 22 alleges that following her conversation with Mr. Mitchell, rather than address the plaintiff's concerns regarding the IDEA, Mrs. Walls-Culotta gave the plaintiff numerous written reprimands. These reprimands are incorporated as Exhibit 6. These reprimands, however, do not provide evidence of adverse employment action as

---

[20] In the unlikely event that the Court concludes that one or more of the plaintiff's allegations survive the motion to dismiss, the Court should strike any allegations and exhibits from the Complaint which do not state a claim.

there is no evidence that these reprimands affected the terms and conditions of the plaintiff's employment.

The reprimands, moreover, are clearly not in response to complaints raised by the plaintiff. As the March 8, 2004 letter states, the plaintiff acted unprofessionally when she and Ms. Walls-Culotta met to discussed the plaintiff's conduct at an EDM meeting held on February 5, 2005. At the EDM meeting, the plaintiff had a bad exchange with Wendy McKeever, one of the special education teachers. Disciplinary actions following particularly onerous interactions with other staff members are matters outside the purview of the civil rights laws. Even if the plaintiff's prior complaints could be considered protected activity, the letter unequivocally establishes that there is no connection between the plaintiff's prior complaints and the letter. Rather, the letter clearly addresses a specific incident between two employees, and the school principal's attempt to intervene and determine what occurred. These types of routine personnel matters do not implicate the civil rights laws.

The letter further evidences the plaintiff's insubordination and continued refusal to cooperate with her superiors, and establishes that the plaintiff continued to have difficulty dealing with other members of her department. After Plaintiff requested that the meeting with Ms. Walls-Culotta be taped, the plaintiff, unconscionably, insinuated that Ms. Walls-Culotta would alter her copy of the tape and, therefore, refused to provide a copy of the tape. In addition, the plaintiff accused Ms. Walls-Culotta, the school principal and her supervisor, of being incompetent. Such insubordination is clearly intolerable under any standard. The remaining letters and the plaintiff's ultimate dismissal are, as demonstrated in the letters, based upon the plaintiff's inability to work

-25-

with other staff members, refusal to cooperate with a plan improve her working

relationships and her refusal to return paperwork, including a signed copy of the March 8,

2004 letter.

In ¶ 30 of the Complaint, the plaintiff contends that by terminating her "because

of her efforts to bring STSD into compliance with the IDEA, Defendants failed to meet

the individual educational needs of handicapped persons." Such an allegation is

conclusory and lacks any basis in fact. Bare allegations of a deprivation will not suffice.

*C.M.*, 2005 WL 899927 at *2. Moreover, the Complaint fails to identify any individual

whose educational needs were not met, or whose needs the plaintiff reasonably believed

were not being met. The asserted "violations" were, at best, minor procedural violations

which the plaintiff could not have reasonably believed deprived any student of an

educational opportunity. The plaintiff's RA retaliation claim, therefore, fails as a matter

of law as there is no conceivable set of facts upon which she can prevail.

## IV.     FIRST AMENDMENT RETALIATION

Public employees have a right to speak on matters of public concern without fear

of retaliation. *Badassare v. New Jersey*, 250 F.3d 188, 194 (3d Cir. 2001). First

Amendment retaliation claims are analyzed under a three step process. *Id.* at 194-95.

The first step requires the plaintiff to establish that her speech was protected. *Id.* To be

protected, the speech must address a matter of public concern. *Id.* If the plaintiff

satisfies this step, she must then demonstrate that her interest in the speech outweighs the

state's countervailing interest as an employer in promoting the efficiency of the public

services it provides through its employees. *Id.* (citing *Pickering v. Bd. of Educ.*, 391 U.S.

563, 68 (1968)). Determining whether the employee's interests outweigh the employer's

requires the Court to engage in a balancing test. *Id.* These questions involve questions of

-26-

law, for the Court to decide. *Id.* Public employees have a greater burden of establishing retaliation than other citizens because of the government's interest in promoting the efficiency of public services. *Rappa v. Hollins*, 991 F.Supp. 367, 374 (D. Del. 1997), *aff'd* 178 F.3d 1280 (3d Cir. 1999).

If the plaintiff gets by these steps, she must then show that her protected speech was a substantial or motivating factor in the allegedly retaliatory conduct. *Baldassare*, 250 F.3d at 195 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 278 (1977)). If the plaintiff meets her burden on this point, the defendant can rebut the claim of retaliation by demonstrating that it would have reached the same decision even in the absence of the protected conduct. *Id.*

### A.     **PUBLIC CONCERN**

Speech by a public employee involves a matter of public concern if it can be fairly considered as relating to any matter of political, social or other concern to the community. *Baldassare*, 250 F.3d at 195. The determination of whether speech is a matter of public concern focuses on the content, form and context of the speech. *Id.* Speech which attempts to bring to light actual or potential wrongdoing or breach of the public trust on the part of governmental officials may involve a matter of public concern. *Id.* To qualify for protection, the speech at issue must be made primarily in the employee's role as a citizen, as opposed to her role as an employee. *Morris v. Crow*, 142 F.3d 1379, 1382 (11th Cir. 1998). *See Pickering v. Brd. of Ed. of Twp. High Sch. Dist. 205, Will County, Illinois*, 391 U.S. 563, 568 (1968) (noting that the teachers interests, as a citizen, in commenting on matters of public concern must be balanced against the states interest as an employer); *Connick v.Myers*, 461 U.S. 138, 143 (1983) (noting that the emphasis in *Pickering* on the right of public employees, *as citizens*, to comment on

-27-

matters of public concern was not accidental, and recognizing that government offices could not function if every employment decision became a constitutional matter).

The test for whether speech addresses a matter of public concern focuses on the value of the speech. *Baldassare*, 250 F.3d at 197. If the value of the speech, based upon its content and the circumstances of communication, are such that the message conveyed would be relevant to the process of self-governance if disseminated to the community at large, the communication should be considered a matter of public concern. *Id.* (citing *Azzaro v. County of Allegheny*, 110 F.3d 968, 977-78 (3d Cir. 1997) (*en banc*)). Speech intended to disclose misfeasance by public employees is protected, while speech disclosing personal grievances is not.[21]

B.    **BALANCING OF INTERESTS**

The balancing test takes into consideration a variety of factors. *Baldassare*, 250 F.3d at 198. Communications made in forums not open to the general public are entitled to less protection than communication made to the general public. *Roseman v.Ind. Univ. of Pennsylvania at Ind.*, 520 F.2d 1364, 1368 (3d Cir. 1975), *cert denied*, 424 U.S. 921 (1976) (holding that a teacher's complaints to other members of her department were essentially private communications, entitled to less protection than statements made to the general public). Employers have a substantial interest in maintaining discipline and harmony among co-workers. *Baldassare*, 250 F.3d at 198.

As the Supreme Court stated in *Connick*:

> [T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes

---

[21] *Swineford v. Snyder County Pennsylvania*, 15 F.3d 1258, 1271 (3d Cir. 1994). *See Czurlanis v. Albanese,* 721 F.2d 98, 104 (3d Cir. 1983) (finding that a county auto mechanic's criticism of internal management of the Dept. of Motor Vehicles was a matter of public concern).

-28-

> the perogative to remove employees whose conduct hinders efficient
> operation and to do so with dispatch. Prolonged retention of a disruptive
> or otherwise unsatisfactory employee can adversely affect discipline and
> morale in the work place, foster disharmony, and ultimately impair the
> efficiency of an office or agency.

*Connick*, 461 U.S. at 151 (quoting Justice Powell's separate opinion in *Arnett v. Kennedy*,

416 U.S. 134, 168 (1974)). *Potential* disruptiveness is enough to outweigh whatever

First Amendment value speech may otherwise have. *Watters v. City of Philadelphia*, 55

F.3d 886, 896 (3d Cir. 1995).

The employee's placement in the organizational hierarchy is a significant factor in

respect to the detrimental impact speech has on the working relationships within an

organization. *Baldassare*, 250 F.3d at 198 (citing *Swineford v. Snyder County Pa.*, 15

F.3d 1258, 1272-73 (3d Cir. 1994), which held that the county voter registrar's interest in

comments regarding electoral improprieties did not outweigh the State's interest in

effiency). "When close working relationships are essential to fulfilling public

responsibilities, a wide degree of deference to the employer's judgment is appropriate."

*Connick*, 461 U.S. at 151-52. Employers do not need to allow events to unfold to the

point of actual disruption of the office and the destruction of working relationships before

taking action. *Id.* at 152.

The disruption is particularly relevant where the speaker's statements call into

question the integrity of the person immediately in charge of running a department. *See*

*Roseman*, 520 F.2d at 1368 (rejecting a First Amendment claim where the speaker called

into question the integrity of the person in charge of running the department). In some

positions, the relationship between superior and subordinate is of such a nature that

public criticism by the subordinate seriously undermines the effectiveness of the working

relationship. *Pickering*, 391 U.S. at 569-70.

When an employee personally confronts her immediate superior, the employer's institutional efficiency may be threatened not only by the content of the message, but by the manner, time and place in which it is delivered. *Connick*, 461 U.S. at 153. When an employee's speech concerns office policy and arises from an employment dispute concerning the very application of the policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office. *Id.*

The Court, therefore, must determine whether the disruption in discipline or disruption in harmony rises to such a level the that government's interests outweigh any free speech interest the plaintiff may have.

### C.    THE PLAINTIFF'S STATEMENTS WERE NOT MATTERS OF PUBLIC CONCERN

Even the most cursory review of the plaintiff's Complaint and exhibits, which are detailed at length in Section III(B), *supra*, establishes that the majority of the statements for which the plaintiff seeks protection were made not in her role as citizen, but in her role as the school psychologist. The procedures she suggested or questioned went to how her job would be performed. Similarly, her personnel disputes were personal matters, which did not arise outside of her job. Her statements were made solely in her capacity as the school psychologist, and not as a private citizen. *Cf. Pickering*, 461 U.S. at 148 (indicating that questions on a survey circulated by a disgruntled employer related to coworkers' confidence in superiors, office morale, and the need for a grievance procedure were not matters of public concern but, rather, related to personal grievance issues). These statements, therefore, are not matters of public concern as a matter of law.

Even if the court concludes, however, that some of the plaintiff's speech related to matters of public concern, the adverse action about which she complains is her termination. The vote regarding the non-renewal of her contract occurred in April of 2004. The exhibits attached to the plaintiff's complaint establish that by March of 2004, the plaintiff had a total lack of confidence in the abilities of her immediate superior, Ms. Walls-Culatta, and she was more than willing to express those opinions. *See* Exh. 6. Plaintiff's insubordination and willingness to impugn the integrity of her immediate supervisor, accuse her superior and the rest of her department of being incompetent, and make false accusations regarding both past and present employees,[22] is clear evidence of the plaintiff's inability to continue working with Mrs. Walls-Culotta, her immediate superior, or the rest of the staff in the Special Education Department.

As the school's only psychologist, it is obvious that the plaintiff could no longer work with or tolerate her co-workers or superiors and, as such, the defendants had ample cause to terminate her contract. The threat to institutional efficiency and the obvious destruction of working relationships was clear and the defendants were not required to stand by and let it continue. Thus even if the statements by the plaintiff prior to and at the meeting addressed matters of public concern, in light of the limited protection provided to public employees making statements in private or semi-private settings, STSD's interests in preventing disruption and continued destruction of working relationships clearly outweighed any interests that the plaintiff may have had with respect

---

[22] To the extent that there is any question with respect to what was said at the meeting on February 9, 2005, the meeting was taped at the plaintiff's request. The plaintiff is in the possession of the only copy of the tape and should be able to make the tape available at the Court's request.

to these statements as a matter of law. The plaintiff's first amendment claim, therefore, fails to state a claim upon which relief can be granted.

## V.       THE PLAINTIFF'S STATE LAW CLAIM FAILS

The plaintiff's wrongful termination claim under state law is based upon violation of public policy. For the reasons set forth in Sections III and IV, *supra*, the plaintiff's public policy arguments fail as a matter of law.

## VI.      THE PLAINTIFF'S COMPLAINT FAILS IN ALL RESPECTS AS TO DEFENDANT HUBER BECAUSE THE COMPLAINT DOES NOT CONTEND THAT HE WAS RESPONSIBLE FOR HER TERMINATION IN ANY MANNER

All counts in the Complaint allege that the defendant's adverse action was the plaintiff's wrongful termination. The Complaint contains numerous allegations against Mrs. Walls-Culotta, but there are not allegations against Mr. Huber regarding her termination as he was not her supervisor at the time. As such, there are no allegations in the Complaint alleging that Mr. Huber was in any way responsible for any adverse action taken against the plaintiff. With respect to Mr. Huber, therefore, the Complaint fails to state a claim as there is no set of facts under which the plaintiff may recover from Mr. Huber. The Complaint against Mr. Huber should be dismissed.

## VII.     ALTERNATIVE     MOTION     FOR     A     MORE     DEFINITE STATEMENT

Suits alleging civil rights violations must meet heightened standards of specificity in pleadings. *Bartholomew v. Fischl*, 782 F.2d 1148, 1151 (3d Cir. 1986). The allegations in civil rights complaints must make specific allegations of unconstitutional conduct, rather than vague and conclusory allegations. *Id.* at 1152. Where the complaint fails to allege facts upon which the court can weigh the substantiality of the claim, plaintiffs must amend their complaints or suffer dismissal. *Id.* As such, to the extent that

-32-

the Court concludes that the allegations otherwise state a claim, Defendants hereby demand a more definite statement as to the allegations of the Complaint, including the of identification of the dates on which the statements/violations occurred, the procedures allegedly violated, the IDEA code sections violated, the relevant parties involved and the meetings where statements were made.

## CONCLUSION

The plaintiff's complaint fails to establish that she engaged in protected activity under the RA because she could not reasonably have believed that the claimed procedural violations deprived any student of an educational opportunity. The Court, therefore, should dismiss the plaintiff's RA claim. In light of the nature and context of her statements, there is no set of facts under which the plaintiff could recover. The Court should also dismiss the plaintiff's First Amendment retaliation claims because even if the plaintiff's speech addressed a matter of public concern, the disruptive nature of the speech and the manner in which it was delivered created actual and/or potential disharmony in the workplace. As such, the employer's interests outweighed the plaintiff's. In light of the fact that the plaintiff's retaliation claims fail, no public policy was violated and, as such, the plaintiff's wrongful termination claim fails as a matter of law as there is no set of facts under which the plaintiff could recover. Alternatively, the court should exercise its discretion to dismiss this pendent state law claim.

To the extent that the Court concludes that one or more of the plaintiff's claims survive, the Court should order the Plaintiff to amend her complaint to plead her retaliation claims with specificity, including the names of the individuals involved, the dates on which statements were made, the precise nature of the statements, and the specific sections of the IDEA violated with respect to each allegedly improper procedure.

-33-

RESPECTFULLY SUBMITTED,

WHITE AND WILLIAMS, LLP

JOHN D. BALAGUER
Bar ID. # 2537
WILLIAM L. DOERLER
Bar ID. # 3627
P.O. Box 709
Wilmington, DE 19899-0709
302-467-4508

Attorneys for Defendants Sussex
Technical School District, Sussex
Technical School District Board of
Education, Sandra Walls-Culotta,
and Steve Huber

Date: 6-6-05

DOCS_DE 110446v1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DOROTHY HOULIHAN,                                    )
                                                     )
    Plaintiffs,                  )
                                                     )    C.A. No.  05-00194 JJF
    v.                           )
                                                     )
SUSSEX TECHNICAL SCHOOL DISTRICT,                    )    TRIAL BY JURY OF TWELVE
SUSSEX TECHNICAL SCHOOL DISTRICT                     )    DEMANDED
BOARD OF EDUCATION, SANDRA WALLS-                    )
CULOTTA, individually, and in her official           )
capacity, and STEVE HUBER, individually, and in      )
his official capacity,                               )
                                                     )
    Defendants.                  )
                                                     )

### CERTIFICATE OF SERVICE

    I, William L. Doerler, Esquire, do hereby certify that on this 6th day of June, 2005, two copies of the foregoing **DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM OR, IN THE ALTERNATIVE, MOTION FOR A MORE DEFINITE STATEMENT** were delivered via First Class Mail, postage prepaid, upon:

        Brian F. Dolan, Esquire
        Stumpf, Vickers & Sandy, P.A.
        8 West Market Street
        Georgetown, DE 19947

        WHITE AND WILLIAMS, LLP

        JOHN D. BALAGUER
        Bar ID. # 2537
        WILLIAM L. DOERLER
        Bar ID. # 3627
        P.O. Box 709
        Wilmington, DE 19899-0709
        302-467-4508

        Attorneys for Defendants Sussex Technical
        School District, Sussex Technical School
        District Board of Education, Sandra Walls-
        Culotta, and Steve Huber