# EXHIBIT D



361 F.3d 1168                                                                    Page 1

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

(Cite as: 361 F.3d 1168)

▷

**Briefs and Other Related Documents**

United States Court of Appeals,
Ninth Circuit.
Richard CEBALLOS, Plaintiff-Appellant,
v.
Gil GARCETTI; Frank Sundstedt; Carol Najera;
County of Los Angeles,
Defendants-Appellees.
No. 02-55418.

Argued and Submitted June 2, 2003.
Filed March 22, 2004.

**Background:** Deputy district attorney filed § 1983 complaint against county and supervisors at district attorneys' office alleging that he was subject to adverse employment actions in retaliation for engaging in protected speech. The United States District Court for the Central District of California, A. Howard Matz, J., granted defendants' motion for summary judgment, and district attorney appealed.

**Holdings:** The Court of Appeals, Reinhardt, Circuit Judge, held that:
(1) memorandum to supervisors at district attorneys' office constituted a matter of public concern for First Amendment purposes;
(2) district attorney's interest in memorandum outweighed the government's interest, and memorandum was thus was protected by First Amendment;
(3) law was clearly established that the speech was protected under the First Amendment;
(4) genuine issues of material fact precluded summary judgment for public officials on qualified immunity grounds; and
(5) district attorneys' office and head district attorney were not entitled to Eleventh Amendment

immunity.
Reversed and remanded.

O'Scannlain, Circuit Judge, concurred specially, and filed opinion.

West Headnotes

**[1] Civil Rights** ⬅➡1376(2)
78k1376(2) Most Cited Cases
Public officials are entitled to qualified immunity for acts that do not violate clearly established constitutional rights of which a reasonable person would have known.

**[2] Constitutional Law** ⬅➡90.1(7.2)
92k90.1(7.2) Most Cited Cases

**[2] District and Prosecuting Attorneys** ⬅➡3(1)
131k3(1) Most Cited Cases
Deputy district attorney's memorandum to supervisors at district attorneys' office alleging that a deputy sheriff included false statements in a search warrant affidavit constituted a matter of public concern for First Amendment purposes, notwithstanding fact that the memorandum was prepared in fulfillment of a regular employment responsibility. U.S.C.A. Const.Amend. 1.

**[3] Constitutional Law** ⬅➡90.1(7.2)
92k90.1(7.2) Most Cited Cases
Although public employees do not relinquish their right to free speech by virtue of their employment, neither do they enjoy absolute First Amendment rights. U.S.C.A. Const.Amend. 1.

**[4] Constitutional Law** ⬅➡90.1(7.2)
92k90.1(7.2) Most Cited Cases
To determine whether a public employee's speech is protected by the First Amendment: (1) a court asks whether the speech addresses a matter of public concern, and, if it does, (2) the court engages in an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                              Page 2

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

inquiry, commonly known as the *Pickering* balancing test, to determine whether the employee's interest in expressing himself outweighs the government's interests in promoting workplace efficiency and avoiding workplace disruption. U.S.C.A. Const.Amend. 1.

**[5] Constitutional Law** ☜45
92k45 Most Cited Cases

**[5] Constitutional Law** ☜90.1(7.2)
92k90.1(7.2) Most Cited Cases
Whether a public employee's speech addresses a matter of public concern is a question of law; this determination is made in light of the content, form, and context of the speech, with content being the greatest single factor in the inquiry. U.S.C.A. Const.Amend. 1.

**[6] Constitutional Law** ☜90.1(7.2)
92k90.1(7.2) Most Cited Cases
A public employee addresses a matter of public concern when his speech relates to an issue of political, social, or other concern to the community. U.S.C.A. Const.Amend. 1.

**[7] Constitutional Law** ☜90.1(7.2)
92k90.1(7.2) Most Cited Cases
Speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern. U.S.C.A. Const.Amend. 1.

**[8] Constitutional Law** ☜90.1(7.2)
92k90.1(7.2) Most Cited Cases
It is only when it is clear that information would be of no relevance to the public's evaluation of the performance of governmental agencies that speech of government employees receives no protection under the First Amendment. U.S.C.A. Const.Amend. 1.

**[9] Constitutional Law** ☜90.1(7.2)
92k90.1(7.2) Most Cited Cases

**[9] District and Prosecuting Attorneys** ☜3(1)

131k3(1) Most Cited Cases
Deputy district attorney's interest in memorandum to supervisors at district attorneys' office alleging that a deputy sheriff included false statements in a search warrant affidavit outweighed the government's interest in promoting workplace efficiency and avoiding workplace disruption, and thus, for summary judgment purposes, was protected by the First Amendment; the government failed to even suggest disruption or inefficiency in the workings of the district attorney's office as a result of attorney's speech. U.S.C.A. Const.Amend. 1.

**[10] Civil Rights** ☜1376(2)
78k1376(2) Most Cited Cases
Clarity
A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.

**[11] Civil Rights** ☜1376(10)
78k1376(10) Most Cited Cases
For purposes of qualified immunity analysis, the law was clearly established that deputy district attorney's memorandum to supervisors at district attorneys' office, alleging that a deputy sheriff included false statements in a search warrant affidavit, addressed a matter of public concern and that attorney's interest in the speech outweighed the government's interest in avoiding inefficiency and disruption, and thus, that the speech was protected under the First Amendment. U.S.C.A. Const.Amend. 1.

**[12] Federal Civil Procedure** ☜2497.1
170Ak2497.1 Most Cited Cases
Genuine issues of material fact existed as to whether county district attorney took adverse employment actions against deputy district attorney in retaliation for attorney's constitutionally protected speech in authoring memorandum to supervisors alleging that a deputy sheriff included false statements in a search warrant affidavit, precluding summary judgment for county district attorney on qualified immunity grounds in § 1983

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                                                                    Page 3

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv.
2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

action brought by deputy district attorney.
U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[13] Federal Courts** ⚏270
170Bk270 Most Cited Cases
Counties are not entitled to sovereign immunity
under the Eleventh Amendment. U.S.C.A.
Const.Amend. 11.

**[14] Civil Rights** ⚏1376(9)
78k1376(9) Most Cited Cases
A state prosecutor is entitled to absolute immunity
from liability under § 1983 for violating a person's
federal constitutional rights when he or she engages
in activities intimately associated with the judicial
phase of the criminal process; however, only
qualified immunity is available to a prosecutor
performing investigatory or administrative
functions. 42 U.S.C.A. § 1983.

**[15] Federal Courts** ⚏269
170Bk269 Most Cited Cases
County district attorneys office's alleged actions
against deputy district attorney, including demoting
attorney, precluding attorney from handling future
murder cases, and denying a promotion to attorney,
were administrative, rather than prosecutorial, and
thus the district attorney's office and the head
district attorney were acting on behalf of the county,
rather than the state, at the time of the alleged
misconduct, and therefore were not entitled to
Eleventh Amendment immunity in deputy district
attorney's § 1983 claim alleging the district
attorneys office subjected attorney to the adverse
employment actions in retaliation for engaging in
protected speech. U.S.C.A. Const.Amends. 1, 11;
42 U.S.C.A. § 1983.
*1170 Humberto Guizar and Luis Carillo,
Montebello, CA, for the Plaintiff-Appellant.

Cindy S. Lee and Adrian Barrio, Glendale, CA, for
the Defendants-Appellees.

Appeal from the United States District Court for
the Central District of California; A. Howard Matz,
District Judge, Presiding. D.C. No. CV-00-
11106-AHM.

Before: REINHARDT, O'SCANNLAIN, and
FISHER, Circuit Judges.

REINHARDT, Circuit Judge:

Richard Ceballos filed this action pursuant to 42
U.S.C. § 1983 contending that he was subjected to
adverse employment actions by his supervisors at
the Los Angeles County District Attorney's Office
in retaliation for engaging in speech protected by
the First Amendment. He also asserts that the
county fails to train, supervise, and discipline its
district attorneys regarding such unlawful retaliation.

The district court granted a motion for summary
judgment in favor of the individual defendants--the
District Attorney (in his individual capacity), the
then-Head Deputy District Attorney, and Ceballos's
immediate supervisor--on the basis of qualified
immunity, and granted a separate motion for
summary adjudication in favor of the county
defendants--the county and the District Attorney (in
his official capacity)--on the basis of Eleventh
Amendment immunity. Given that the disputed
facts must be resolved in Ceballos's favor and that
all inferences that may reasonably be drawn must
also be drawn in his favor, we reverse the district
court's rulings. We hold that, for purposes of
summary judgment, qualified immunity was not
available to the individual defendants because the
law was clearly established that Ceballos's speech
addressed a matter of public concern and that his
interest in the speech outweighed the public
employer's interest in avoiding inefficiency and
disruption. Because the Eleventh Amendment does
not apply to political subdivisions of the state, the
county could ordinarily not assert sovereign
immunity, although in this case it could do so if
such immunity applied to the District Attorney.
Whether the District Attorney, when acting in his
official capacity, is entitled to such immunity
depends on whether he was performing a state or a
county function when he took the alleged actions
with respect to Ceballos. We hold that in most
respects he was acting in the latter capacity. Thus,
he is not entitled to Eleventh Amendment immunity,
and neither is the County.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                                    Page 4

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

(Cite as: 361 F.3d 1168)

## BACKGROUND

Ceballos has been a deputy district attorney since 1989. In 1997 or 1998 he was assigned to the District Attorney's Office's Pomona Branch and about a year later was promoted to calendar deputy, with supervisory responsibilities over two to three deputy district attorneys. In late February 2000, a defense attorney in *People v. *1171 Cusky*, a case then being prosecuted by the District Attorney's Office, told Ceballos that he believed that one of the arresting deputy sheriffs may have lied in a search warrant affidavit. He asked Ceballos to investigate. Ceballos was supervising the deputy district attorney assigned to the case, but he decided to investigate the allegations himself. After reviewing the relevant documents in the case and visiting the crime scene, Ceballos determined that the affidavit of the deputy sheriff had, at the least, grossly misrepresented the facts.

Ceballos discussed the problems arising from this investigation with others in the Office, including his immediate supervisor, Carol Najera and the then-Head Deputy District Attorney, Frank Sundstedt. Everyone agreed that the validity of the warrant was questionable. On March 2, 2000, Ceballos sent Sundstedt a memorandum discussing his determination that the affidavit was falsified and recommending that the case be dismissed. Sundstedt instructed Ceballos to revise the memorandum to make it less accusatory of the deputy sheriff. Ceballos rewrote the memorandum, and a meeting was held on March 9 with representatives from the Sheriff's Department, Sundstedt, Najera, Ceballos, and another deputy district attorney.

Following the meeting with the Sheriff's Department, Sundstedt was not certain that *Cusky* should be dismissed and decided to proceed with the case pending the outcome of a motion challenging the search warrant, which had already been filed by the defense. [FN1] Ceballos informed defense counsel that he believed the affidavit contained false statements, and defense counsel subpoenaed him to testify at the hearing. Ceballos

told Najera that pursuant to *Brady v. Maryland* and other case law, he was obligated to turn over to the defense the memoranda he had prepared regarding his opinion of the legality of the search warrant. Ceballos contends that Najera instructed him to edit the memorandum to include statements by only one detective and to limit his in-court testimony. When Ceballos testified at the hearing on the motion, the *Cusky* court sustained the prosecution's objections to several questions defense counsel asked him. Ceballos maintains that, as a result, he was unable to tell the court certain of his conclusions (and the reasons therefor) regarding the accuracy of the warrant. The defendant's motion was denied, and the prosecution proceeded. Having testified for the defense, Ceballos was removed from the *Cusky* prosecution team.

> FN1. The motion asserted that there was a statement or omission in the warrant that was made deliberately or in reckless disregard of the truth, and that had the judge approving the warrant known the truth regarding the statement, he would not have issued it.

Ceballos alleges that Garcetti, Sundstedt, and Najera retaliated against him for submitting the memorandum regarding the *Cusky* warrant, for otherwise reporting to or discussing with other persons the allegations of misconduct by the deputy sheriff, and for testifying truthfully at the court hearing. He alleges that the defendants took a number of retaliatory actions against him: (1) they demoted him from his position of calendar deputy to that of trial deputy; (2) Najera "threatened" him when he told her that he would testify truthfully at the hearing; (3) at the hearing itself Najera was "rude and hostile" to him; (4) Sundstedt "gave [him] the silent treatment"; (5) Najera informed him that he could either transfer to the El Monte Branch, or, if he wanted to remain in the Pomona Branch, he would be re-assigned to filing misdemeanors, a position usually assigned to junior deputy district attorneys; [FN2] (6) the one murder case he was *1172 handling at the time was reassigned to a deputy district attorney with no

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                                              Page 5

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

experience trying murder cases; [FN3] (7) he was barred from handling any further murder cases; and (8) he was denied a promotion.

> FN2. The transfer to the El Monte Branch is described by Ceballos as an act of "Freeway Therapy," a practice of punishing deputy district attorneys by assigning them to a branch requiring a long commute to work.

> FN3. Ceballos asserts that denying him the opportunity to prosecute the murder case adversely affected his opportunities for promotion.

Ceballos filed a complaint in the district court pursuant to § 1983 against Najera, Sundstedt, and then-District Attorney Gil Garcetti in their individual capacities, as well as against Garcetti in his official capacity and the County of Los Angeles. He sought lost wages and other compensatory damages as well as injunctive relief. The county defendants moved for summary adjudication, which the district court granted on the ground that the Eleventh Amendment barred the action. Ceballos amended his complaint, and the individual defendants moved for summary judgment, which was granted on the ground that they were protected by qualified immunity. The district court declined to exercise jurisdiction over Ceballos's state law claim for intentional infliction of emotional distress. Ceballos appeals.

**ANALYSIS**

**I. Individual Defendants and Qualified Immunity**

[1] Ceballos argues that the district court erred in holding that the individual defendants were entitled to qualified immunity. Public officials are entitled to qualified immunity for acts that do not violate "clearly established ... constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Rivero v. City & County of*

*San Francisco,* 316 F.3d 857, 863 (9th Cir.2002). When considering a defendant's motion for summary judgment on the ground of qualified immunity, we must first determine whether, when the facts are taken in the light most favorable to the plaintiff and the inferences are drawn in his favor as well, these facts and inferences establish that the official's conduct violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If so, we must next consider whether the right was clearly established at the time of the alleged improper act. *Id.* If the right was clearly established, we ask finally whether despite this fact, the official's unconstitutional conduct constituted a reasonable mistake of fact or law. *Id.* at 199, 121 S.Ct. 2151. Then, unless the constitutional error is excused on that ground, summary judgment must be denied.

**A. Ceballos's Speech Was Protected By the First Amendment**

Ceballos contends that he exercised his First Amendment right to free speech in alleging that a deputy sheriff included false statements in the *Cusky* search warrant affidavit. The parties appear to dispute to whom Ceballos spoke about the alleged misconduct. Ceballos asserts that he told Sundstedt and Najera, other persons in the District Attorney's Office, Sheriff's Department personnel, the *Cusky* judge, and defense counsel about the untruthful affidavit. The defendants state that Ceballos "sent the memorandum to one person, Sundstedt," the Head Deputy District Attorney, but do not expressly dispute Ceballos's assertion that he spoke to the others as well. It is unclear whether the defendants contend that Ceballos's memorandum is all that is relevant here or that the other speech to which Ceballos refers did not occur. For the reasons set *1173 forth below, we hold that, for purposes of summary judgment, Ceballos's allegations of wrongdoing in the memorandum constitute protected speech under the First Amendment; accordingly, we need not determine here whether similar protection should be afforded to his other communications. Those matters are best explored at trial.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

[2][3][4] Although public employees do not relinquish their right to free speech by virtue of their employment, neither do they enjoy absolute First Amendment rights. *Waters v. Churchill*, 511 U.S. 661, 671-74, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977-78 (9th Cir.1998). To determine whether Ceballos's speech is protected by the First Amendment, we apply a two-step test that stems from the Supreme Court's holdings in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968):(1) we ask whether the speech addresses a matter of public concern, and, if it does, (2) we engage in an inquiry, commonly known as the *Pickering* balancing test, to determine whether Ceballos's interest in expressing himself outweighs the government's interests "in promoting workplace efficiency and avoiding workplace disruption." *Rivero*, 316 F.3d at 865 (quoting *Hufford v. McEnaney*, 249 F.3d 1142, 1148 (9th Cir.2001)).

**1. Matter of Public Concern [FN4]**

> FN4. We are concerned here only with on-the-job, work-related speech. *Cf. Roe v. City of San Diego*, 356 F.3d 1108 (9th Cir.2004) (addressing the public concern test in the context of a public employee's off-duty, non-work-related speech).

[5] Whether a public employee's speech addresses a matter of public concern is a question of law. *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. 1684. This determination is made in light of "the content, form, and context" of the speech. *Coszalter v. City of Salem*, 320 F.3d 968, 973-74 (9th Cir.2003) (internal quotation marks omitted). Content is "the greatest single factor in the *Connick* inquiry." *Johnson v. Multnomah County*, 48 F.3d 420, 424 (9th Cir.1995) (quoting *Havekost v. United States Dep't of the Navy*, 925 F.2d 316, 318 (9th Cir.1991) ).

[6][7] A public employee addresses a matter of public concern when his speech relates to an issue

of " 'political, social, or other concern to the community.' " *Brewster*, 149 F.3d at 978 (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. 1684); *see also Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir.1995). "Speech that concerns issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government merits the highest degree of first amendment protection." *Coszalter*, 320 F.3d at 973 (internal quotation marks omitted). In contrast, "speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies, is generally not of public concern." *Id.*

In defining the scope of First Amendment protection accorded to public employees' speech, the Supreme Court has distinguished between speech "as a citizen upon matters of public concern" at one end and speech "as an employee upon matters only of personal interest" at the other. *Connick*, 461 U.S. at 147, 103 S.Ct. 1684. *Connick* dealt with an assistant district attorney's allegations that her supervisors retaliated against her for distributing a questionnaire to her colleagues. The Supreme Court held that when the assistant district attorney solicited her colleagues' *1174 views on office morale, the policy for transferring employees, the need for a grievance committee, and the level of confidence in supervisors, her speech was not protected by the First Amendment because these questions were intended primarily to "gather ammunition for another round of controversy" in the employee's individual personnel dispute. *Id.* at 148, 103 S.Ct. 1684. In contrast, when the assistant district attorney asked her colleagues whether they felt pressured to work in political campaigns, her speech *was* a matter of public concern under the First Amendment because "the issue of whether assistant district attorneys are pressured to work in political campaigns is a matter of interest to the community upon which it is essential that public employees be able to speak out freely without fear of retaliatory dismissal." *Id.* at 149.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                                                              Page 7

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

(Cite as: 361 F.3d 1168)

[8] What is critical under *Connick,* as we explained in *Roth v. Veteran's Admin. of United States,* is the "point of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" 856 F.2d 1401, 1406 (9th Cir.1988). Thus, "[i]t is only 'when it is clear that ... the information would be of *no* relevance to the public's evaluation of the performance of governmental agencies' that speech of government employees receives no protection under the First Amendment." *Ulrich v. City & County of San Francisco,* 308 F.3d 968, 978 (9th Cir.2002) (quoting *Pool v. Vanrheen,* 297 F.3d 899, 907 (9th Cir.2002)).

The individual defendants concede that Ceballos's allegations that an arresting deputy sheriff may have lied in a search warrant affidavit constitutes whistleblowing. We have held that when government employees speak about corruption, wrongdoing, misconduct, wastefulness, or inefficiency by other government employees, including law enforcement officers, their speech is inherently a matter of public concern. *See, e.g., Blair v. City of Pomona,* 223 F.3d 1074, 1079 (9th Cir.2000); *Johnson,* 48 F.3d at 425. The defendants do not argue that Ceballos's First Amendment interest is diminished because his purpose was primarily to further a personal personnel dispute. Instead, they contend that Ceballos's allegations of law enforcement perjury should not be protected because he included them in a memorandum to his supervisors that he prepared in fulfillment of an employment responsibility.

Under *Connick,* speech that is protected by virtue of its content does not lose that protection simply because the speech is directed to other employees of that governmental employer rather than to members of the public. 461 U.S. at 147-49, 103 S.Ct. 1684. In particular, we have repeatedly held that speech exposing official wrongdoing is no less deserving of First Amendment protection because the public employee reported the misconduct to his supervisors rather than to the news media. *See, e.g.,*

*Hufford,* 249 F.3d at 1150 ("It would be absurd to extend First Amendment protection only to those whistle-blowers who immediately appear on the local news."); *Ulrich,* 308 F.3d at 979 ("[T]he public employee does not forfeit his protection against governmental retaliation because he chose to press his cause internally."); *Keyser v. Sacramento City Unified Sch. District,* 265 F.3d 741, 747 (9th Cir.2001) (holding that employees did not forgo First Amendment protection when they met with the School District's board for the purpose of charging that their supervisor's evaluation practices violated District policy and that he was misusing federal funds).

Nor do our cases provide any support for the defendants' contention that a public **\*1175** employee's speech is deprived of First Amendment protection whenever those views are expressed, to government workers or others, pursuant to an employment responsibility. In *Roth,* the plaintiff was fired from his position as "trouble shooter" at the Veterans Administration after he exposed corruption, mismanagement, and other problems in written reports that were prepared as part of his job responsibilities. 856 F.2d at 1406. Concluding that Roth's comments were not to further personal grievances, but rather "for the express purpose of addressing ... problems besetting the VA, at the wish of the defendants and for the good of the institution, the Veterans it serves, and the public," we held that Roth could not be denied First Amendment protection simply because his efforts to expose wrongdoing were included in reports written pursuant to his employment duties. *Id.*

In other cases we have similarly found public employees' speech to be a matter of public concern even though it was made in furtherance of an employment responsibility. In *Nunez v. Davis,* 169 F.3d 1222, 1226 (9th Cir.1999), a judge directed the court administrator to assign only those clerks who had worked on his reelection campaign to attend training sessions. In protest of the policy, the administrator arranged for two clerks who did not campaign for the judge to attend the sessions. *Id.* We held that this act of protest constituted symbolic

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                                                     Page 8

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

speech on a matter of public concern. *Id.* at 1228; *see also Pool,* 297 F.3d at 907-08 (holding that an employee whose job duties included addressing diversity and acting as a liaison to the African American and Latino communities spoke on matters of public concern when she spoke about issues of racial and ethnic diversity in the sheriff's office).

Although our cases are clear, our specially concurring colleague contends that we should revisit en banc our holdings in *Roth* and its progeny and establish a per se rule that public employees are not protected by the First Amendment when their speech is uttered in the course of carrying out their employment obligations. We disagree. The right of public employees to speak freely on matters of public concern is important to the orderly functioning of the democratic process, because public employees, by virtue of their access to information and experience regarding the operations, conduct, and policies of government agencies and officials,"are positioned uniquely to contribute to the debate on matters of public concern." *Weeks v. Bayer,* 246 F.3d 1231, 1235 (9th Cir.2001) (quoting *Gilbrook v. City of Westminster,* 177 F.3d 839, 870 (9th Cir.1999)). Stripping them of that right when they report wrongdoing or other significant matters to their supervisors would seriously undermine our ability to maintain the integrity of our governmental operations. [FN5]

> FN5. Our colleague tries to justify his proposed rule by explaining that public employees do not have a personal interest in speech relating to their employment duties "other than in doing [their] job well." *Post* at 1189. This proposition is significant, he argues, because the underlying premise of the First Amendment is to protect against infringements upon "individuals' freedom of choice to express *their personal* opinion or otherwise to express *themselves*." *Post* at 1189 (emphasis in the original). While we agree that the First Amendment facilitates individual autonomy, its

protections do not turn upon whether a citizen has a personal interest in a particular expressive activity. Indeed, under *Connick,* personnel grievances, which are often highly personal, do not receive protection at all. As we reiterated above, free speech is essential to an effective democratic process as an institutional matter; we do not value it simply because of the right of individuals to speak on subjects of personal interest. Lest we forget, however, many public servants *do* have a personal stake in ensuring that events surrounding their employment comport with the public interest. Government employees have often sacrificed far more remunerative opportunities in other sectors in response to compelling public needs, such as the inspirational call of our President in 1961:"Ask not what your country can do for you--ask what you can do for your country." For such employees, promoting the public good is a deeply personal mission that is at least as important as personal career advancement.

***1176** The proposed per se rule would be particularly detrimental to whistle-blowers, such as Ceballos, who report official misconduct up the chain of command, because all public employees have a duty to notify their supervisors about any wrongful conduct of which they become aware. To deprive public employees of constitutional protection when they fulfill this employment obligation, while affording them protection if they bypass their supervisors and take their tales, for profit or otherwise, directly to a scandal sheet or to an internet political smut purveyor defies sound reason.

Moreover, such a per se rule would violate the principles established by *Connick.* Subject to the *Pickering* balancing test, First Amendment protections are available to public employees who suffer retaliation for whistleblowing, regardless of whether the act of whistleblowing consists of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                                                    Page 9

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv.
2399, 2004 Daily Journal D.A.R. 3541

(Cite as: 361 F.3d 1168)

informing higher level public officials, Congressional committees, or the media. The Supreme Court in *Connick* made no distinction between internal and external whistleblowing when it noted that speech that is "of public import in evaluating the performance of the District Attorney" may include efforts by an employee "to bring to light actual or potential wrongdoing or breach of public trust." *Connick,* 461 U.S. at 148, 103 S.Ct. 1684. [FN6]

> FN6. The special concurrence further expresses doubts that Ceballos has a "cognizable First Amendment interest" because as a prosecutor, his statements must be attributed to the government, which"has no First Amendment rights." *Post* at 1189-90. However, a public employee who seeks to expose corruption by reporting his concerns to his supervisor is not acting as a spokesperson for the government when he makes his report. We need not consider here under what circumstances a prosecutor assigned to prosecute a corruption case is speaking for the government when he publicly discusses the corrupt practices involved. Thus, contrary to our concurring colleague's belief, there is no conflict between our decision in *Roth,* 856 F.2d 1401, and its progeny, on one hand, and *Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), and its progeny, on the other.

Other circuits have also rejected any per se rule that a public employee does not receive any First Amendment protection for speech that occurs within the scope of his employment duties. *See, e.g., Lewis v. Cowen,* 165 F.3d 154, 161-64 (2d Cir.1999) (holding that a public employee did not forgo First Amendment protection when he refused to present proposed policy changes in a positive light to the Connecticut Gaming Policy Board); *Baldassare v. New Jersey,* 250 F.3d 188, 197 (3d Cir.2001) (holding that an internal investigator's statement about other employees' alleged criminal

actions "falls squarely within the core public speech delineated in *Connick* " even though his job duties included exposing wrongdoing); *Kennedy v. Tangipahoa Parish Library Bd. of Control,* 224 F.3d 359, 367-376 (5th Cir.2000) (refusing to deny First Amendment protection to a library branch manager who wrote a letter to her supervisors suggesting security measures to be taken at library branches); *Rodgers v. Banks,* 344 F.3d 587, 597-602 (6th Cir.2003) (refusing to deny protection to a director of quality management who sent a memorandum stating that the reconfiguration of a patient area would have an adverse effect on patient care); *Taylor v. Keith,* 338 F.3d 639, 643-46 (6th Cir.2003) (holding that police reports raising allegations of brutality *1177 against fellow officer touched upon a matter of public concern); *Delgado v. Jones,* 282 F.3d 511, 519 (7th Cir.2002) (refusing to deny protection to an officer's allegations of criminal activities involving a relative of an elected official simply because he included them in a memorandum to his supervisors); *Dill v. City of Edmond,* 155 F.3d 1193, 1202-03 (10th Cir.1998) (holding that an officer's statements and reports to his supervisors regarding his belief that exculpatory evidence existed and was being withheld in a murder case involved a matter of public concern); *Fikes v. City of Daphne,* 79 F.3d 1079, 1084 (11th Cir.1996) (holding that a police officer's report of misconduct by fellow officers in a high-speed chase addressed a matter of public concern). [FN7]

> FN7. The special concurrence claims that *Roth,* 856 F.2d 1401, and its progeny are responsible for a lopsided circuit split, *post* at 1187-88, but the cases discussed in the text reveal that the weight of authority in other circuits accords with our precedents. Although in some instances other circuits have held that public employees' speech pursuant to job-related duties did not involve matters of public concern, it was ordinarily because the speech at issue primarily involved either personal grievances or the "routine discharge of assigned functions, where there is no

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 10

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

suggestion of public motivation." *Delgado,* 282 F.3d at 519; *see also Dill,* 155 F.3d at 1202-03; *Morris v. Crow,* 142 F.3d 1379, 1381-83 (11th Cir.1998); *cf. Oladeinde v. City of Birmingham,* 230 F.3d 1275, 1292 (11th Cir.2000). Only the Fourth Circuit seems to be moving toward a rule that public employees' speech in the course of carrying out employment obligations is not protected under the First Amendment. *See Urofsky v. Gilmore,* 216 F.3d 401, 407-08 (4th Cir.2000) (en banc).

Aside from *Urofsky,* all of the cases that our colleague cites, *post* at 1187-88, either have been narrowed by one or more of the decisions cited in the text above, or they do not stand for the broad rule ascribed to them. *Compare Terrell v. Univ. of Tex. Sys. Police,* 792 F.2d 1360, 1362 (5th Cir.1986), *with Kennedy v. Tangipahoa Parish Library Bd. of Control,* 224 F.3d 359, 367-376 (5th Cir.2000); *compare Thomson v. Scheid,* 977 F.2d 1017, 1021 (6th Cir.1992), *with Rodgers v. Banks,* 344 F.3d 587, 597-602 (6th Cir.2003), and *Taylor v. Keith,* 338 F.3d 639, 643-46 (6th Cir.2003); *compare Gonzalez v. City of Chicago,* 239 F.3d 939, 941-942 (7th Cir.2001), *with Delgado v. Jones,* 282 F.3d 511, 519 (7th Cir.2002); *compare Buazard v. Meridith,* 172 F.3d 546, 548 (8th Cir.1999), *with Herts v. Smith,* 345 F.3d 581, 585-86 (8th Cir.2003); *compare Koch v. City of Hutchinson,* 847 F.2d 1436 (10th Cir.1988), *with Dill v. City of Edmond,* 155 F.3d 1193, 1202-03 (10th Cir.1998). Accordingly, unlike our colleague, we do not perceive any "deep confusion" in the other circuits; rather, these cases point to the nearly unanimous opposition of the federal courts to the imposition of a per se rule denying all First Amendment protection to public employees' speech pursuant to their job-related duties.

To the extent that the defendants or our colleague

may be suggesting the adoption of a narrower per se rule--a rule that would deny First Amendment protection to speech contained in routine reports or made in the performance of routine job functions--we strongly disagree. The mere fact that a public employee exposes individual wrongdoing or government misdeeds when making a regular as opposed to a special report does not, by itself, result in the denial of First Amendment protection. Whether a job duty is routine or non-routine is a far less important factor for purposes of First Amendment analysis than the content of the public employee's speech.

Regardless of the form in which a government worker makes charges of corruption, criminal misconduct, or public waste, such charges raise serious public concerns that merit careful assessment and justify full application of the *Connick* principles. Indeed, a report that would ordinarily be considered routine by virtue of its form may well become non-routine by virtue of its content, such as when it contains serious charges of official wrongdoing. Finally, a per se rule stripping all First Amendment*1178 protection from speech uttered in the performance of routine, as opposed to non-routine, job functions would be inconsistent with the very nature of the *Connick* test which contains a second step that requires us to balance various factors, including some of those that concern our concurring colleague.

In short, that Ceballos prepared his memorandum in fulfillment of a regular employment responsibility does not serve to deprive him of the First Amendment protection afforded to public employees. Not only our own precedent, but sound reason, Supreme Court doctrine, and the weight of authority in other circuits support our rejection of a per se rule that the First Amendment does not protect a public employee simply because he expresses his views in a report to his supervisors or in the performance of his other job-related obligations. Such speech, like all other public employee speech, is subject to the full two-part *Connick* test described above.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                                                                                   Page 11

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

(Cite as: 361 F.3d 1168)

## 2. Balancing Test

[9] Even though Ceballos's speech constituted a matter of public concern, it is not protected by the First Amendment unless the court also finds that his interest in the speech outweighs the government's interests "in promoting workplace efficiency and avoiding workplace disruption." *Rivero,* 316 F.3d at 865; *accord Pickering v. Bd. of Educ.,* 391 U.S. 563, 571, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The employer bears the burden of proving that the balance of interests weighs in its favor. *Johnson,* 48 F.3d at 426. The " 'more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made.' " *Id.* (quoting *Hyland v. Wonder,* 972 F.2d 1129, 1139 (9th Cir.1992)).

The defendants contend that under our holding in *Brewster,* the *Pickering* balancing test favors them because Ceballos spoke to other government employees and not to the public or the media. While in *Brewster* we stated that a "narrow, limited focus and a limited audience weigh against a claim of protected speech," 149 F.3d at 981 (internal quotation marks omitted), we also recognized that "the private nature of the statement does not remove it from the realm of 'public concern' altogether." *Id.* (quoting *Rankin v. McPherson,* 483 U.S. 378, 387 n. 11, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)); *see also Ulrich,* 308 F.3d at 979; *Nunez,* 169 F.3d at 1228. Indeed, the Supreme Court has ruled that speech need not be made publicly in order to come within the protection of the First Amendment. *See Givhan v. Western Line Consolidated Sch. Dist.,* 439 U.S. 410, 415-16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). Again, the decisive question is whether the employee spoke with the intention of bringing wrongdoing to light, because we have held that "in a good-faith whistleblowing context, the breadth of one's audience is irrelevant." *Hufford,* 249 F.3d at 1150.

Assuming, for the purposes of our analysis, that the speech at issue is only the memorandum Ceballos sent to Sundstedt, there can be no disputing the fact that he included the material charging misconduct

on the part of a law enforcement officer "to bring wrongdoing to light, not merely to further some purely private interest." *Ulrich,* 308 F.3d at 979 (internal quotations omitted). Even if Ceballos's audience was limited, this factor would provide little support to the individual defendants' claim of disruption and inefficiency under *Pickering* because the speech was uttered in a "good-faith whistleblowing context." *Hufford,* 249 F.3d at 1150 .

The defendants next maintain that their interests outweigh those of Ceballos because his charges of misconduct by the deputy sheriff were found to be erroneous *1179 by the *Cusky* court. The falsity of a statement is a factor to be considered in the *Pickering* balance. *Moran v. Washington,* 147 F.3d 839, 849-50 (9th Cir.1998). We have recognized, however, that in order to encourage public employees to speak out on matters of public concern, the First Amendment will ordinarily be held to protect even false statements, because

> while false statements are not deserving, in themselves, of constitutional protection, "erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.' " *New York Times Co. v. Sullivan,* 376 U.S. 254, 271-72, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (quoting *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)).

*Johnson,* 48 F.3d at 424. In *Johnson,* we considered the weight to be accorded in a *Pickering* balancing to false statements made with reckless disregard for the truth. *Johnson,* 48 F.3d at 421-26. While noting that recklessly false statements serve a "very limited" First Amendment interest, *id.* at 426 (citing *Arnett v. Kennedy,* 416 U.S. 134, 162-63, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974)), we nonetheless held that even such statements "are not per se unprotected by the First Amendment when they substantially relate to matters of public concern. Instead, the recklessness of the employee and the falseness of the statements should be considered in light of the public employer's showing of actual injury to its legitimate interests, as part of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                                                                  Page 12

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

(Cite as: 361 F.3d 1168)

the *Pickering* balancing test." *Id.* at 424.

Unlike in *Johnson,* there is no evidence here that Ceballos spoke recklessly, or that he acted in bad faith. At most, the evidence suggests that his statements proved to be erroneous. As the individual defendants concede, prosecutors have a duty to disclose information favorable to an accused, including information relating to a witness's veracity and integrity. Good-faith statements made in pursuit of this obligation, even if they may ultimately turn out to be incorrect, do not warrant retaliatory action. [FN8] Accordingly, if Ceballos's statements in the memorandum to his supervisor are ultimately determined to be erroneous, the erroneous nature of the statements *might* lessen the weight of his interests under the *Pickering* balancing test, but that factor would in any event not be sufficient by itself to deprive Ceballos of all First Amendment protection. [FN9]

> FN8. We do not mean to suggest, however, that every action-critical, corrective, or otherwise--that a public employer takes in response to an employee's good-faith whistleblowing is retaliatory, and thus, impinges on First Amendment rights.

> FN9. Ceballos argues that the *Cusky* court's determination that the search warrant affidavit was acceptable does not show that his statements were incorrect. We may assume that Ceballos's statements were in error, however, because ultimately, for purposes of summary judgment, given the good-faith nature of his statements and the other factors we consider in the *Pickering* balance, our result is no different whether or not Ceballos's assertions were correct.

Assuming *arguendo* that Ceballos's limited audience and purportedly erroneous statements diminish the weight of his First Amendment interests, the individual defendants do not meet their burden under *Pickering* because they offer no explanation as to how Ceballos's memorandum to

his supervisors resulted in inefficiency or office disruption. Ceballos tried to address the problem initially by reporting the matter to his supervisors, obviously an appropriate way of seeking a responsible solution. *Cf., Moran,* 147 F.3d at 849-50 (holding *Pickering* factors favored defendant where deputy commissioner charged **1180** with carrying out commissioner's public outreach program criticized program and refused to carry it out, thereby undermining commissioner's ability to implement policy initiative and disrupting workings of office); *Pool,* 297 F.3d at 908-09 (holding *Pickering* factors favored defendants where high-profile employee of the sheriff's office, who worked in a (" 'confidential, policy-making, or public contact role,' " made crude public comments regarding the sheriff that detrimentally affected the workings of the office) (quoting *Moran,* 147 F.3d at 846). As the defendants recognize, Ceballos was doing his job by investigating allegations of law enforcement misconduct in a case being prosecuted under his direction and reporting those that appeared to be meritorious to his supervisors. It is difficult to imagine how the performance of one's duties in this manner could be disruptive or inefficient--much less how any such "disruption" or "inefficiency" could outweigh the public's interest in the exposure of corrupt or unlawful practices in the Sheriff's Department. *See Hufford,* 249 F.3d at 1149 (" '[I]t would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office.' ") (quoting *Roth,* 856 F.2d at 1407-08)); *Johnson,* 48 F.3d at 427 ("[T]he County does not have a legitimate interest in covering up mismanagement or corruption and cannot justify retaliation against whistle-blowers as a legitimate means of avoiding the disruption that necessarily accompanies such exposure.") In any event, because the defendants have failed even to suggest disruption or inefficiency in the workings of the District Attorney's Office, there is little for us to weigh in favor of the individual defendants under *Pickering.*

In sum, Ceballos's speech addressed a matter of public concern and his interest in the speech

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                                Page 13

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

outweighed the defendants' administrative interests. Thus, we hold that, for summary judgment purposes, his speech was protected by the First Amendment.

**B. The Constitutional Right Was Clearly Established**

Even if Ceballos's speech is constitutionally protected, the defendants are nonetheless entitled to qualified immunity if the constitutional right was not clearly established at the time of the alleged violation.

[10] A right is "clearly established" when the contours of the right are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. To determine whether qualified immunity applies, we must consider the application of the right in the specific context in question. *Brewster,* 149 F.3d at 977. This does not mean "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," however, but rather that "in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (internal quotation marks and citations omitted). Indeed, " '[o]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.' " *Id.* at 741, 122 S.Ct. 2508. In order to find that the law was clearly established, then, "we need not find a prior case with identical, or even 'materially similar,' facts." *Flores v. Morgan Hill Unified Sch. Dist.,* 324 F.3d 1130, 1136-37 (9th Cir.2003) (quoting *Hope,* 536 U.S. at 741, 122 S.Ct. 2508). Instead, we must "determine whether the preexisting law provided the defendants with 'fair warning' that their conduct was unlawful." *Id.* at 1137 (quoting *Hope,* 536 U.S. at 741, 122 S.Ct. 2508).

*1181 The individual defendants argue that it was not clearly established that (1) an employee can speak on a matter of public concern when he speaks pursuant to a job responsibility or (2) under the

*Pickering* balancing test, Ceballos's statements were protected by the First Amendment.

As discussed above, however, as early as 1988 we held that speech made pursuant to an employment duty can be a matter of public concern. *See, e.g., Roth,* 856 F.2d at 1406; *Pool,* 297 F.3d at 908. The defendants' argument that the law in this respect was not clearly established is therefore without merit.

[11] With respect to the *Pickering* test, the defendants contend that the *Pickering* balance favors them because Ceballos spoke only to Sundstedt, not to a larger or public audience, and the statements were determined by the *Cusky* court to be false. Yet even if Ceballos spoke only to Sundstedt, and even if the statements were incorrect (there is no evidence that they were made in bad faith or recklessly), the defendants make no assertion that Ceballos's speech caused actual, or even potential, office disruption or inefficiency. Thus, this argument fails as well.

We have recognized that, although the qualified immunity inquiry in a *Pickering* balancing case is context-specific, *see Brewster,* 149 F.3d at 979-80, where the balancing factors weigh heavily in favor of the employee the law is clearly established, and qualified immunity is therefore unavailable. *See Gilbrook,* 177 F.3d at 867-70; *Lytle v. Wondrash,* 182 F.3d 1083, 1089 (9th Cir.1999). Moreover, "there is a series of cases in the Ninth Circuit establishing that the public's interest in learning about illegal conduct by public officials and other matters at the core of the First Amendment protection outweighs a [public] employer's interest in avoiding a mere *potential* disturbance to the workplace." *Keyser,* 265 F.3d at 748 (discussing our previous holdings including *Gilbrook,* 177 F.3d at 867-70, *Roth,* 856 F.2d at 1403-08, and *Johnson,* 48 F.3d at 425-28). Given our prior cases, therefore, the defendants were on fair notice that the *Pickering* balance strongly favored Ceballos. The law, therefore, was clearly established in this respect as well.DECIDED:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                                                          Page 14

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

## C. The Officials' Acts Were Not Objectively Reasonable

There is one more hurdle that Ceballos must clear. Whether or not the law was clearly established, Ceballos may not prevail if the official's "mistake as to what the law requires is [objectively] reasonable." *Saucier,* 533 U.S. at 205, 121 S.Ct. 2151. The individual defendants argue that their conduct was objectively reasonable because the undisputed evidence shows that all of the "employment decisions of which Plaintiff complained were undertaken for non-retaliatory reasons."

[12] The defendants are mistaken. It is possible that they will be able to show at trial that the adverse acts Ceballos alleges were not taken in retaliation for his constitutionally protected speech. However, "[a]s with proof of motive in other contexts, this element of a First Amendment retaliation suit ... involves questions of fact that normally should be left for trial." *Ulrich,* 308 F.3d at 979 (citing *Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999)). They may not be resolved on summary judgment. At trial, the individual defendants will have the opportunity to refute Ceballos's evidence that they acted with a retaliatory motive, or to prove that they would have taken the same actions for other reasons even in the absence of such a motive. *See Ulrich,* 308 F.3d at 976- 77.

The individual defendants make no argument that, in light of our clearly established law, it was objectively reasonable *1182 for them to take the adverse employment actions against Ceballos on the basis of the retaliatory motives that he alleges they possessed. Nor could they. Retaliatory motives do not constitute a sound basis for employment decisions. Here, with all disputed factual questions resolved in favor of Ceballos and drawing all reasonable inferences in his favor, "the *Pickering* balancing so clearly weighs in favor of[Ceballos] that it was patently unreasonable for defendants to conclude that the First Amendment did not protect his speech." *Gilbrook,* 177 F.3d at 870.

The individual defendants' actions were not objectively reasonable. We therefore reject the qualified immunity defense. [FN10]

> FN10. Although the district court did not reach the question, at oral argument the defendants asked us to hold that the undisputed facts show that Ceballos's speech was not a substantial or motivating factor causing the adverse employment actions taken against Ceballos. We are unable to do so. On the basis of the record before us, a reasonable jury could infer that Ceballos's speech was a substantial motivating factor.

## II. County Defendants and Sovereign Immunity

Ceballos next claims that the County of Los Angeles and Garcetti, in his official capacity as District Attorney of Los Angeles County, are liable for the alleged violation of his constitutional rights. The district court did not reach the merits of these claims; rather, it held that they were barred (directly or indirectly) by the Eleventh Amendment to the United States Constitution, because the Los Angeles County District Attorney acted on behalf of the state when he took the actions of which Ceballos complains.

[13] Counties are not entitled to sovereign immunity. *Eason v. Clark County School Dist.,* 303 F.3d 1137, 1141 (9th Cir.2002) (citing *Lincoln County v. Luning,* 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890)). Here, however, the County can be held liable only if the District Attorney acted as a county officer. If the District Attorney was a state officer when he engaged in the acts of which Ceballos complains, he is entitled to Eleventh Amendment immunity (to the extent that he is sued in his official capacity) and the County cannot be held liable for those acts. Thus liability for both county defendants depends on the same question: whether the District Attorney acted on behalf of the state or the county. With that in mind, we now analyze the role of the District Attorney in relation to the proceeding before us.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.