361 F.3d 1168                                                                                                    Page 15

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

Ordinarily, an official designated as an official of a county--as is the District Attorney of the County of Los Angeles--is a county official for all purposes. Some officials, however, serve two masters. Among them are California's 58 district attorneys: While these officers are elected by and for the counties, they prosecute cases on behalf of the state. In such mixed circumstances, we determine whether the officer is a state or a county official by examining state law to determine whether the particular acts the official is alleged to have committed fall within the range of his state or county functions. *McMillian v. Monroe County,* 520 U.S. 781, 785-86, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). 3469 The California Supreme Court has held that a district attorney is a state official when he acts as a public prosecutor, while in other functions he acts on behalf of the county:

> He is at once the law officer of the county and the public prosecutor. While in the former capacity he represents the county and is largely subordinate to, and under the control of, the [county] board of supervisors, he is not so in the latter. In the prosecution of criminal cases he *1183 acts by the authority and in the name of the people of the state.

*Pitts v. County of Kern,* 17 Cal.4th 340, 70 Cal.Rptr.2d 823, 949 P.2d 920, 932-33 (Cal.1998). The *Pitts* court thus concluded that a claim alleging prosecutorial misconduct is a claim against the state. *Id.* at 930-37; *see also Weiner,* 210 F.3d at 1026, 1030 (holding the San Diego County District Attorney acted on behalf of state in allegedly hiding exculpatory evidence from criminal defendant, while noting that its holding did not imply that "district attorneys in California are state officers for all purposes"). District attorneys performing investigatory and other functions, however, are officers of the county. *See, e.g., Bishop Paiute Tribe v. County of Inyo,* 275 F.3d 893, 906-10 (9th Cir.2002) (reviewing state constitution and statutes and concluding that district attorney and sheriff acted as county officials in obtaining and executing search warrant), *vacated on other grounds,* 538 U.S. 701, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003).

Whether the District Attorney acted on behalf of the county or the state thus turns on whether the personnel actions alleged by Ceballos are part of the District Attorney's prosecutorial functions or whether he was performing administrative or other non-prosecutorial duties. The California courts have not defined the precise characteristics that distinguish a district attorney's prosecutorial function from his other functions. As *Bishop Paiute Tribe* noted, however, a similar issue as to whether a prosecutor was acting in his prosecutorial capacity, as opposed to an administrative or investigative capacity, arises in determining whether he is entitled to absolute or qualified immunity under § 1983; we may look for guidance to cases addressing that issue. *See id.* at 908-09. [FN11]

> FN11. *Bishop Paiute Tribe, Pitts,* and *Weiner* all considered whether an officer acted on behalf of the state or the county for the purpose of establishing whether there could be liability under § 1983. Whereas political subdivisions of states, along with their agencies and officials are "person[s]" for the purpose of § 1983 liability, *see Monell,* 436 U.S. at 663, 98 S.Ct. 2018; 18 U.S.C. § 1983 (providing only that "person[s] ... shall be liable"), states, state agencies, and state officials sued in their official capacity are not. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Although these cases did not consider the Eleventh Amendment issue we address here, the same distinction, between states and state officials on the one hand and counties and county officials on the other, controls the outcome under both analyses. *Cf. Aguon v. Commonwealth Ports Auth.,* 316 F.3d 899, 901-02 (9th Cir.2003) (applying factors from Eleventh Amendment analysis to determine whether an entity is arm of the state and therefore not a "person" under § 1983); *Cortez v. County of Los Angeles,* 294 F.3d 1186, 1188 (9th Cir.2002) ("[A] state and its officials sued in their official capacity are not considered 'persons' within

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                                                       Page 16

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

the meaning of § 1983, due to the sovereign immunity generally afforded states by the Eleventh Amendment."). Similarly, the issue whether an officer is acting as a prosecutor for purposes of determining absolute or qualified immunity in § 1983 actions involves the same considerations as the issue whether he is acting as a prosecutor for purposes of determining sovereign immunity under the Eleventh Amendment. Thus, the § 1983 cases we discuss guide our decision here.

[14] A state prosecutor "is entitled to absolute immunity from liability under § 1983 for violating a person's federal constitutional rights when he or she engages in activities 'intimately associated with the judicial phase of the criminal process.' " *Broam v. Bogan,* 320 F.3d 1023, 1028 (9th Cir.2003) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). Only qualified immunity is available, however, to a prosecutor "performing investigatory or administrative functions." *Broam,* 320 F.3d at 1028. While the line between the functions is not entirely clear, *id.* at 1029, it is clear that *1184 "absolute prosecutorial immunity [is justified] only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct." *Burns v. Reed,* 500 U.S. 478, 494, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991). Actions for which there is absolute immunity include, for example, preparing and filing an information and a motion for an arrest warrant, *Kalina v. Fletcher,* 522 U.S. 118, 129, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997), initiating a prosecution, *Imbler,* 424 U.S. at 430, 96 S.Ct. 984, and withholding evidence during trial, *id.* at 431-32 n. 34, 96 S.Ct. 984. Actions that are not directly related to the judicial process do not give rise to absolute immunity, even if they occur after a prosecution is initiated. *Broam,* 320 F.3d at 1031. Thus, when a prosecutor acts as an investigator, *Buckley v. Fitzsimmons,* 509 U.S. 259, 274 n. 5, 113 S.Ct. 2606, 125 L.Ed.2d 209, testifies as a witness in an *ex parte* proceeding, *Dela Cruz v. Kauai County,* 279 F.3d 1064, 1067 (9th Cir.2002), or performs administrative duties, *Broam,* 320 F.3d

at 1029, he receives only qualified immunity.

[15] Ceballos alleges that the District Attorney's Office took several retaliatory actions against him: that he was (1) demoted from his position of calendar deputy; (2) given the choice to transfer to the El Monte Branch or to remain in Pomona but be re-assigned to filing misdemeanors (a position usually assigned to junior deputy district attorneys); (3) removed from prosecuting the only murder case he was handling at the time; (4) precluded from handling future murder cases; and (5) denied a promotion. [FN12]

> FN12. While it is not altogether clear, we assume that Ceballos's allegations that Najera and Sundstedt were "rude and hostile" towards him, gave him the "the silent treatment," and "threatened" him are not intended as allegations of independent harms but rather as support for his assertion that the other alleged harms were retaliatory in nature.

Among these alleged acts of retaliation, only the removal of Ceballos from a particular murder case he was handling fell within the District Attorney's prosecutorial function, because it alone is "intimately associated with the judicial phase of the criminal process." *Id.* at 1028. With that one exception, Ceballos does not complain of actions taken as part of a prosecution. He does not argue, for example, that there was a violation when the District Attorney's Office decided to pursue the *Cusky* prosecution despite his recommendation that it be dismissed. Neither does he complain of his removal from the *Cusky* case. Rather he challenges Garcetti's personnel decisions concerning his promotion, demotion, and transfer-decisions squarely within the District Attorney's administrative function. Even the decision not to reassign Ceballos to future murder cases was a personnel decision, and was unrelated to any particular prosecution or ongoing judicial proceeding. Indeed, the defendants' own arguments lend support to our conclusion that the alleged retaliatory acts were not prosecutorial in nature:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

The individual defendants, including Garcetti, do not seek dismissal on the basis of absolute immunity for the acts they allegedly took against Ceballos. Instead, they seek qualified immunity, implicitly acknowledging that the actions were not prosecutorial, but administrative.

In sum, the District Attorney's Office and its then-head, Garcetti, were carrying out their county functions when they allegedly engaged in the retaliatory acts Ceballos describes. Garcetti is, therefore, not entitled to Eleventh Amendment immunity, and thus the County may not seek summary adjudication on the ground that he was acting on behalf of the state. Because the district court did not decide any other issues pertaining to the county defendants, *1185 we decline to do so here. Accordingly, we reverse.

**III. Intentional Infliction of Emotional Distress**

Having granted final judgment against Ceballos with respect to all of his federal claims, the district court declined to exercise jurisdiction over his state law claim of intentional infliction of emotional distress. Because we reverse the district court's judgment on the federal claims, we reverse its determination as to the state law claim as well.

**CONCLUSION**

For the foregoing reasons, we reverse the district court and remand for further proceedings.

**REVERSED and REMANDED.**

O'SCANNLAIN, Circuit Judge, specially concurring:

I write separately because although I concur in the court's opinion that *Roth v. Veteran's Administration of the United States,* 856 F.2d 1401 (9th Cir.1988), controls the result, I believe that *Roth* was wrongly decided and that it ought to be overruled, perhaps even by our court's rehearing the present case en banc.

I

As we recently recounted, *see Roe v. City of San Diego,* 356 F.3d 1108, 1114-15 (9th Cir.2004), for much of this Nation's history, our courts generally accepted then-Judge Holmes's immoderately narrow view of the First Amendment rights of public employees: "[A constable] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 220, 29 N.E. 517 (Mass.1892). Beginning in the mid-part of the twentieth century, in response to the proliferation of loyalty oaths and other grave restrictions on the expressive and associational rights of public employees, the Supreme Court dramatically began to cast aside the Holmesian logic. *See, e.g., Keyishian v. Board of Regents,* 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (invalidating state statutes denying public employment on the basis of membership in the Communist Party or other subversive political organizations); *Cramp v. Board of Public Instruction,* 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961) (invalidating state loyalty oath requiring state employees to deny membership in the Communist Party and to refuse to "lend aid, support, advice, counsel or influence to the Communist Party"); *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (invalidating loyalty oath prohibiting membership in a "communist front" or other "subversive" organization).

The Supreme Court's burgeoning recognition of public employees' First Amendment rights reached its first apex in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), where the Court held unconstitutional the dismissal of a public school teacher who had published in his local newspaper a letter that sharply criticized the Board of Education and superintendent of schools. Striving to accommodate the expressive rights of public employees with the special needs of the government in its capacity as a day-to-day employer, the *Pickering* Court explained:

The theory that public employment which may be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                                                                     Page 18

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected. At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between *1186 the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Id.* at 568, 88 S.Ct. 1731 (citation and quotations omitted). Applying its test to the case at bar, the Court concluded that "absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* at 574, 88 S.Ct. 1731.

Over the course of the ensuing decade and a half, lower courts struggled to define the terms of, and to apply, *Pickering's* amorphous balancing test. In apparent recognition, the Supreme Court attempted to clarify its doctrine in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1982). There, the Justices confronted a challenge brought by a public employee who claimed that her First Amendment rights had been violated when she was fired after having circulated an internal office questionnaire that (in the Court's words) was "most accurately characterized as an employee grievance concerning internal office policy." *Id.* at 154, 103 S.Ct. 1684. Focusing largely on whether the employee's speech touched on matters of "public concern" as "determined by the content, form, and context of a given statement," *id.* at 147-48, 103 S.Ct. 1684, the Court also took pains to recognize that "[t]he repeated emphasis in *Pickering* on the right of a public employee 'as a citizen, in commenting upon matters of public concern,' was not accidental," *id.* at 143, 103 S.Ct. 1684, and it

h[e]ld only that when a public employee speaks not *as a citizen* upon matters of public concern, but instead *as an employee* upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Id.* at 147, 103 S.Ct. 1684 (emphasis added).

II

It was against this backdrop that in *Roth,* a three-judge panel of our court held that when a public employee speaks on matters of public importance, his or her speech falls automatically within the protective ambit of the First Amendment. [FN1] *Roth,* 856 F.2d at 1406 ("Both the content and context of Roth's speech reveal that it concerned matters of public importance, and thus deserves protection."); *see also id.* ("Roth's speech concerned matters of public importance and thus was protected."). Yet in so holding, *Roth* minimized--indeed, it entirely ignored--the significance of *Connick's* distinction between speech offered by an public employee acting *as an employee* in carrying out his or *1187 her ordinary employment duties and speech spoken by an employee acting *as a citizen* expressing his or her personal views on disputed matters of public import. Instead, *Roth* asserted that the relevant constitutional inquiry focuses solely on the "point of the speech in question: Was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" *Roth,* 856 F.2d at 1405 *(quoting Callaway v. Hafeman,* 832 F.2d 414, 417 (7th Cir.1987)) *(quoting Linhart v. Glatfelter,* 771 F.2d 1004, 1010 (7th Cir.1985)). As the majority today reiterates, *Roth's* formulation led inexorably to the conclusion that "it is only when it is clear that ... the information would be of *no* relevance to the public's evaluation of the performance of governmental agencies that speech of government employees receives no protection under the First Amendment." Maj. Op. at 1174 *(quoting Ulrich v. City & County of San Francisco,* 308 F.3d 968, 978 (9th Cir.2002) ) (quotation omitted) (emphasis in original).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                                                           Page 19

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

FN1. Of course, the fact that certain speech by public employees may fall within the scope of the First Amendment does not mean that governmental constraints on such speech are unconstitutional *per se*. As we explained in *Brewster v. Bd. of Educ.*, 149 F.3d 971, 979 (9th Cir.1998) (citations and quotations omitted):
[T]he fact that an employee's expression touches on an issue of public concern does not automatically entitle him to recovery. The public concern prong is a necessary, but not a sufficient, condition of constitutional protection. It merely brings the claim within the coverage of the First Amendment, and thus ensures that a court will test the reasons for restriction against first amendment standards. In determining whether speech involving a matter of public concern merits constitutional protection, courts engage in a balancing test, first announced in *Pickering*. ...

That conclusion--that the First Amendment encompasses *any* speech by a public employee that touches upon matters of public importance, notwithstanding what might best be described as the "role" of its speaker--is at odds with the Supreme Court's instruction in *Connick*. *Connick* teaches us that the relevant constitutional distinction is not merely between speech touching on matters of public significance and speech that does not, but between speech spoken "*as a citizen* upon matters of public concern [and that offered] *as an employee* upon matters only of personal interest." *Id.* at 147, 103 S.Ct. 1684 (emphasis added); *see also United States v. Nat'l Treas. Employees Union*, 513 U.S. 454, 465-466, 115 S.Ct. 1003, 130 L.Ed.2d 964 (highlighting that "with few exceptions, the content of respondents' messages has nothing to do with their jobs" and that virtually no aspect of the claimants's expressive activity "has any relevance to their employment," and pointedly observing that "[W]e have applied *Pickering's* balancing test only when[as in this case] the employee spoke '*as a citizen* upon matters of public concern' rather than '

*as an employee* upon matters only of personal interest.' ") (quoting *Connick* with its own added emphasis); *see also id.* at 480, 486, 115 S.Ct. 1003 (O'Connor, J., dissenting in part) (arguing that the relevant speech restrictions were unconstitutional only insofar as they related to "expressive activities that bear no nexus to Government employment," and suggesting that the relevant regulations should be severed because similar concerns did not apply where "the subject matter is directly related to the individual's official duties"). *Roth* thus collapses a critical dimension of *Connick's* two-pronged inquiry: By focusing only on *Connick's* public concern/purely personal interest axis, *Roth* improperly quashes the controlling caselaw's accompanying distinction between an employee's viewpoint-laden personal speech and his or her ordinary job-related speech.

III

In fairness to the *Roth* court, *Connick* did not fully rationalize the distinction it drew between speech offered by a public employee acting *as an employee* carrying out his or her ordinary job duties and that spoken by an employee acting *as a citizen* expressing his or her personal views on disputed matters of public import. Nor, for the most part, have the six other circuits which--in contrast to this court--at various points reiterated the importance of *Connick's* citizen speech-employee speech distinction. *See, e.g., Gonzalez v. City of Chicago*, 239 F.3d 939, 942 (7th Cir.2001) ("[T]here are still limits in public employment as to what can be fairly characterized as speech 'as a citizen' on a matter of *1188 public concern. Speech exercised by a public employee in the course of his employment will rarely fit the mold of private speech by a citizen."); *Urofsky v. Gilmore*, 216 F.3d 401, 407 (4th Cir.2000) (en banc) ("[C]ritical to a determination of whether employee speech is entitled to First Amendment protection is whether the speech is 'made primarily in the [employee's] role as citizen or primarily in his role as employee.' ") (quoting *Terrell v. Univ. of Tex. Sys. Police*, 792 F.2d 1360, 1362 (5th Cir.1986) (alteration in original)); *Buazard v. Meridith*, 172 F.3d 546, 548-49 (8th Cir.1999) ("Unless the employee is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00194-JJF    Document 16-7    Filed 11/03/2005    Page 6 of 11

361 F.3d 1168                                                                                          Page 20
361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541
(Cite as: 361 F.3d 1168)

speaking as a concerned citizen, and not just as an employee, the speech does not fall under the protection of the First Amendment.... [T]here is no indication that[the plaintiff], in making, or refusing to change, his statements, was taking any action as a concerned citizen, rather than simply as an employee following orders or refusing to follow them."); *Gillum v. City of Kerrville,* 3 F.3d 117, 120-21 (5th Cir.1993) ("[W]e d[o] not focus on the inherent 'importance' of the subject matter of the speech, but on the extent to which the terminated employee spoke as a citizen or employee...."); *Thomson v. Scheid,* 977 F.2d 1017, 1020 (6th Cir.1992) ("First Amendment protection extends to a public employee's speech when he speaks as a citizen on a matter of public concern, but does not extend to speech made in the course of acting as a public employee."); *Koch v. Hutchinson,* 847 F.2d 1436, 1442-43 (10th Cir.1988) (en banc) (declining "to establish a per se rule exempting speech made in the course of an employee's official duties," but viewing "that fact as militating against a finding that the speech addressed matters of public concern" and noting that "it is a significant factor in the balancing required under *Pickering* "). [FN2] Notwithstanding the relative opacity of *Connick's* explanation for its differentiation between citizen and employee speech, however, there is a strong First Amendment basis for its having drawn such a distinction.

> FN2. Admittedly, the failure of these courts fully to rationalize their recognition of *Connick's* distinction among the roles of a public-employee speaker has in some instances emboldened subsequent panels putatively to distinguish these cases, or otherwise to attempt to narrow the scope of their holdings. *Cf. Taylor v. Keith,* 338 F.3d 639, 643-46 (6th Cir.2003); *Delgado v. Jones,* 282 F.3d 511, 519 (7th Cir.2002) ; *Kennedy v. Tangipahoa Parish Library Bd. of Control,* 224 F.3d 359, 367- 376 (5th Cir.2000); *Dill v. City of Edmond,* 155 F.3d 1193, 1202 (10th Cir.1998). At times, these efforts have been particularly thin, *e.g., Delgado,* 282 F.3d at 519

("[Officer] Delgado's communications with his superiors were designed not only to convey information of possible crimes, but also *additional facts* that were relevant to the manner and scope of any subsequent investigation.") (emphasis in original); at others, they have provoked great consternation within those courts. *E.g., Teague v. City of Flower Mound,* 179 F.3d 377, 383 (5th Cir.1999) ("Moreover, the rule of orderliness forbids one of our panels from overruling a prior panel; to the extent that *Wilson's* language contradicts the 'primary role'/balancing test of *Terrell* (and *Moore* ), decided years earlier, it is of no effect."), *ironically, itself disregarded by Kennedy,* 224 F.3d at 370 n. 13 ("[T]he rule of orderliness has little persuasive force when the prior panel decision at issue conflicts with a Supreme Court case to which the subsequent panel decision is faithful.").

In any event, such deep confusion within the circuits over the scope of *Connick* --indeed, over the scope of their own cases interpreting *Connick*--seems a clarion call for higher review.

A

While it has rarely been stated explicitly by the Supreme Court, the implicit premise underlying the First Amendment's hostility toward viewpoint-driven rules abridging the freedom of speech is that such constraints impermissibly infringe upon individuals' freedom of choice to express *1189 *their personal* opinions or to otherwise express *themselves.* As the Court put the point in *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 75- 76, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (emphasis added) (internal citations omitted):

> [T]here are deprivations less harsh than dismissal that nevertheless press state employees and applicants to conform *their beliefs and associations* to some state-selected orthodoxy. The First Amendment is not a tenure provision, protecting public employees from actual or constructive discharge. The First Amendment

361 F.3d 1168                                                                                                    Page 21

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

prevents the government ... from wielding its power to interfere with its *employees' freedom to believe and associate, or to not believe and not associate.*
See also *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) ("For at least a quarter century, this Court has made clear that ... the government ... may not deny a benefit to a person on a basis that infringes *his* constitutionally protected interests--especially *his interest in freedom of speech.* ... [M]ost often we have applied this principle to denials of public employment.") (emphasis added).

The problem is that when public employees speak in the course of carrying out their routine, required employment obligations, they have no *personal* interest in the content of that speech that gives rise to a First Amendment right. Instead, their speech is, in actuality, the State's. I do not dispute the court's characterization of the relevant facts of this case--which it presents, as it must, in the light most favorable to Ceballos, see *Coszalter v. City of Salem,* 320 F.3d 968, 973 (9th Cir.2003)--but I believe that actually quoting Ceballos's own statement of the operative facts may be particularly illustrative here. In his opposition to the defendants' motion for summary judgment below, Ceballos described as follows the basis for the speech that he now claims to fall within the protections of the First Amendment:

> Pursuant to his duties as a prosecutor, [Ceballos] wrote a memo expressing his concerns about the veracity of the officers in [*People v. Cuskey* ]. He then informed his supervisors he intended to comply with his duties under *Brady v. Maryland,* [373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ], which required him to turn his memo over to defense counsel.

*Plaintiff's Statement in Opposition to Defendants' Separate Statement of Uncontroverted Facts and Conclusions of Law* at 4. Counsel for plaintiff reiterated that description of the facts at oral argument:

> Ceballos prepared a memorandum describing [the results of his investigation] and told his supervisors that he should disclose that

information to the defense under *Brady v. Maryland* as he is required to do so. This is a prosecutorial function that he's engaged in at this time, when he's doing what he is supposed to do.

As these statements indicate, Ceballos had no *personal* stake (other than in doing his job well), and no cognizable First Amendment interest, in the speech for which he now seeks protection--his performance of the basic communicative duty *Brady* imposes on "the prosecution." See *Brady,* 373 U.S. at 87, 83 S.Ct. 1194. [FN3] Indeed, as *1190 the Supreme Court has explained, "[t]he prosecutor's office is an entity and as such it is the spokesman for the Government. A [statement] made by one attorney must be attributed, for these purposes, to the Government." *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ( citing Restatement (Second) of Agency § 272). Of course, "the Government" has no First Amendment rights. Only individuals do.

> FN3. Plaintiff's own characterization of the relevant conduct--"This is a prosecutorial function that [Ceballos is] engaged in at this time, when he's doing what he is supposed to do"--more than effectively disposes of the majority's suggestion that Ceballos may not have been acting in a governmental capacity with respect to the speech giving rise to this litigation. *Cf.* Maj. Op. at 1175-76 n. 5. To the extent the majority's response strains narrowly to construe Ceballos's repeated statements about his *Brady* obligations--as referring merely to his internal office communications--such an unduly constricted construction is utterly belied by the reality of this lawsuit. Let us not forget that Ceballos's action is predicated upon an allegation of retaliation that supposedly stemmed from the facts that: pursuant to *Brady,* he informed defense counsel that he thought the *Cuskey* search warrant affidavit contained false statements; turned his *Brady* memorandum over to the defense; and eventually testified about the contents of that *Brady* memorandum. *See*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168 Page 22

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

> Maj. Op. at 1171. In each of those instances, Ceballos was simply "doing what he was supposed to do" as a deputy district attorney carrying out non-discretionary quintessentially "prosecutorial function[s]."

B

*Roth's* extension of First Amendment protections to such routine, required job-related activity effectively has--no less than an extension of such safeguards to the personnel grievances at issue in *Connick* would have-- "plant[ed] the seed of a constitutional case" in every task that every public employee ever performs, every time that any public employee merely does "what he is supposed to do." *Connick,* 461 U.S. at 149, 103 S.Ct. 1684. At bottom, after all, everything a public employee does in the course of carrying out the requirements of his or her job ultimately is connected to the public interest and relevant to citizens' "making informed decisions about the operation of their government," *Coszalter,* 320 F.3d at 973. *Terrell,* 792 F.2d at 1360 ("Because almost anything that occurs within a public agency could be of concern to the public, we do not focus on the inherent interest or importance of the matters discussed by the employee."); *Gillum,* 3 F.3d at 120-21 ("[Our] focus on the hat worn by the employee when speaking rather than upon the 'importance' of the issue reflects the reality that at some level of generality almost all speech of state employees is of public concern.").

Indeed, with *Roth* as precedent and now *Ceballos* on the books, what federal or state employment-based decision can possibly evade intrusive federal constitutional review? Suppose that, instead of retaining private counsel as it has here, the County had provided its own staff attorney representation. Suppose further that the deputy county counsel assigned to defend this case had (just like the majority) quite mistakenly, but also quite sincerely, come to the conclusion that Ceballos indeed has a viable First Amendment retaliation claim and, consequently, went so far as to file a brief in this court not only agreeing with the claims made by Ceballos's counsel, but providing additional arguments to support them. Could the County discipline its counsel without fear of being hauled into federal court to defend itself against allegations of having committed a constitutional violation? Evidently not--for as the majority makes pellucid today, *Roth* and its progeny would enable such counsel plausibly to claim some personal stake in the message conveyed by that brief. This is precisely the kind of absurd result that *Connick* sought to avoid by stressing the distinction between employee and citizen speech:

> The repeated emphasis in *Pickering* on the right of a public employee 'as a citizen, in commenting upon matters of public concern,' was not accidental. *1191 This language, reiterated in all of *Pickering's* progeny, reflects both the historical evolvement of the rights of public employees, and the common sense realization that government offices could not function if every employment decision became a constitutional matter.

*Connick,* 461 U.S. at 143, 103 S.Ct. 1684.

C

Finally, holding as *Roth* did that the First Amendment protects speech offered by a public employee in the course of carrying out his or her ordinary job responsibilities "creates a fundamental and unnecessary schism" between the Supreme Court's caselaw addressing speech by public employees and its caselaw addressing speech that otherwise is government-funded or state-sponsored. *Urofsky,* 216 F.3d at 408 n. 6. Consider the Supreme Court's instruction in *Rosenberger v. Rector and Visitors of the Univ. of Va.,* 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (emphasis added):

> [W]hen the State is the speaker, it may make content-based choices. When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed *when it is the speaker or when it enlists private entities to convey its own message.* In the same vein, in *Rust v. Sullivan,* [500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ], we upheld the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                                                   Page 23

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

government's prohibition on abortion-related advice applicable to recipients of federal funds for family planning counseling. There, the government did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to *its own program.* We recognized that when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes. 500 U.S. at 194, 111 S.Ct. 1759. When the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee.

*See also Rust,* 500 U.S. at 198-99, 111 S.Ct. 1759 ("[E]mployees remain free ... to pursue abortion-related activities when they are ... acting as private individuals."). Writing for the *Urofsky* en banc court, Judge Wilkins adeptly explained the appropriately analogous nature of these two lines of authority:

> In both situations--public employee speech and government-funded speech--the government is entitled to control the content of the speech because it has, in a meaningful sense, "purchased" the speech at issue through a grant of funding or payment of a salary. The limits of government control are similar in both types of cases, as well: Just as the government as provider of funds cannot dictate the content of speech made outside the confines of the funded program, *see* [*Rust v. Sullivan,* 500 U.S. 173,] at 198, 111 S.Ct. 1759, 114 L.Ed.2d 233, the government as employer is restricted in its ability to regulate the speech of its employees when they speak not as public employees, but as private citizens on matters of public concern.

*Urofsky,* 216 F.3d at 408 n. 6. There simply is no plausible basis for *Roth's* holding that the government may not exercise control over its employees' routine job-related speech, when it assuredly may exercise precisely such control over the speech it subsidizes through its funding decisions.

D

The majority's response is long on policy, but short on the law. Its argument is seductively simple: Because whistle-blowers *1192 play an important role in rendering government accountable, the First Amendment must protect their whistleblowing activities. Maj. Op. at 1174-76. How can anyone disagree with that general principle? Those who "blow the whistle" on government corruption or mismanagement do deserve reasonable legal protections, and such protections most certainly play an important role in discouraging official misfeasance by facilitating wider public exposure of improper conduct--and the identities of those miscreants responsible for it.

Indeed, were I member of Congress charged with making laws that promote sound public policy--and not merely a federal judge charged with interpreting the Constitution--I might well have voted in favor of legislation like the federal Civil Service Reform Act of 1978, Pub.L. No. 95-454, 92 Stat. 1111 (codified in scattered sections of 5 U.S.C.), as modified by the Whistleblower Protection Act of 1989, Pub.L. No. 101-12, 103 Stat. 16 (codified in scattered sections of 5 U.S.C.). It provides, *inter alia,* that no federal

> employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall ... take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of--
> (A) any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences ... a violation of any law, rule, or regulation....

5 U.S.C. § 2302(b)(8) (enumeration omitted).

Or, were I a state legislator, perhaps I would have voted to enact a law like the California Whistleblower Protection Act, Cal. Gov't Code § 8547 *et seq.* It imposes severe criminal liability upon, and establishes a private cause of action for both actual and punitive damages against, "[a]ny person who intentionally engages in acts of reprisal, retaliation, threats, coercion, or similar acts against a state employee or applicant for state employment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                                 Page 24

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

for having made a protected disclosure," Cal. Gov't Code § 8547.8(b) & (c), which state law in turn defines as:

> any good faith communication that discloses or demonstrates an intention to disclose information that may evidence ... any activity by a state agency or by an employee that is undertaken in the performance of the employee's official duties ... and that is in violation of any state or federal law or regulation, including, but not limited to, corruption, malfeasance, bribery, theft of government property, fraudulent claims, fraud, coercion, conversion, malicious prosecution, misuse of government property, or willful omission to perform duty....

Cal. Gov't Code § 8547.2(b) & (d). How strange it must now be for the hundreds, if not the thousands, of legislators throughout this country who have voted to enact or to retain such laws now to discover that their votes were essentially meaningless--that the First Amendment already provided public employees with protections co-extensive with, and in many respects even greater than those purportedly conferred by, the legislation they crafted and helped shepherd through their state legislative processes. *See, e.g.,* Alaska Stat. 39.90.100-.150; Ariz.Rev.Stat. § 38-532; Haw.Rev.Stat. §§ 378-62 & 378-63; Idaho Code §§ 6-2101-2109; Or.Rev.Stat. §§ 659A.200-.224; Wash. Rev.Code §§ 42.40.010 -.910 & 42.41.010-.902.

This case--and the doctrine it ratifies--thus implicates more than the too-common tendency of well-intentioned jurists to squeeze a policy-oriented square peg into a round constitutional hole. For despite the majority's paean "to the orderly functioning *1193 of the democratic process," Maj. Op. at 1175, I fear that *Roth* and its progeny actually pose something of a challenge to the concept of representative democracy itself. More than one hundred years ago, James Bradley Thayer explained:

> The exercise of [judicial review], even when unavoidable, is always attended with a serious evil, namely, that the correction of legislative mistakes comes from the outside, and the people

thus lose the political experience, and the moral education and stimulus that comes from fighting the question out in the ordinary way, and correcting their own errors. The tendency of a common and easy resort to this great function, now lamentably too common, is to dwarf the political capacity of the people, and to deaden [their] sense of moral responsibility. It is no light thing to do that.

James Bradley Thayer, *John Marshall* 103-04, 106-07 (1901), *quoted in* Alexander Bickel, *The Least Dangerous Branch* 22 (2d ed.1986). In this case, of course, the majority has not struck down an unwise enactment; instead, it has rendered utterly superfluous a bevy of wise ones. With such Platonic Guardians, [FN4] who needs elected representatives at all?

> FN4. *See* Learned Hand, *The Bill of Rights* 70 (1958).

### E

Properly understood, *Connick* teaches that although speech uttered by public employees must address an issue of public import in order to come within the protective shelter of the First Amendment, satisfaction of such a virtually necessary condition is not by itself sufficient to trigger constitutional constraints on governmental action. Instead, employee speech solicits the protection of the First Amendment only when it also results from the employee's decision to express his or her *personal* opinions--that is, those views he or she holds *as a citizen* and not as a public employee. The First Amendment, in short, does not protect public employees' routine and required speech on behalf of the government.

### IV

Our jurisprudence concerning the free speech rights of public employees is now frayed at both ends. While the panel's decision in this case was still pending, another three-judge panel of this court ruled that a police officer's sale of home videos depicting him "alone, with his face partially masked, taking off a generic police uniform and masturbating," *see Roe,* 356 F.3d at 1110, fell

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

361 F.3d 1168                                                                                                Page 25

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**(Cite as: 361 F.3d 1168)**

sufficiently within the ambit of the First Amendment that the City of San Diego's decision to terminate his employment was subject to balancing under *Pickering* and *Connick*. Remarkably, that panel so ruled notwithstanding the fact that such pornographic displays "may not be honestly considered 'as relating to any matter of political, social, or other concern to the community.' " *Roe,* 356 F.3d at 1128 (Wardlaw, J., dissenting) (*quoting Connick,* 461 U.S. at 146, 103 S.Ct. 1684).

Between *Roe* and *Roth,* the Ninth Circuit now provides that a public employee's speech will be given some degree of First Amendment protection even when it is not based in some personal interest (as opposed to that of the government itself) and even if it fails to touch upon matters of public import (as opposed to those that are purely private). With this lethal combination, the twin pillars of *Pickering* and *Connick*--that speech by public employees must stem *both* from some individual interest *and* address a matter of public import in order to merit constitutional protection--have been felled.

**\*1194** While the court quite properly applies *Roth* as binding precedent in this case, the time has come for us to reappraise our jurisprudence concerning the free speech rights of the publicly-employed and the scope of legitimate governmental regulation in its capacity as employer. Because *Roth* is inconsistent with *Connick's* careful differentiation between public employees' speech as citizens and speech in their role as employees, I believe that *Roth* should be overruled--if not by our court sitting en banc, then, in due course, by the Supreme Court, to steer this court's drifting First Amendment jurisprudence back to its proper moorings.

361 F.3d 1168, 85 Empl. Prac. Dec. P 41,855, 150 Lab.Cas. P 59,871, 21 IER Cases 97, 04 Cal. Daily Op. Serv. 2399, 2004 Daily Journal D.A.R. 3541

**Briefs and Other Related Documents (Back to top)**

• 2002 WL 32303091 (Appellate Brief) Appellant's Opening Brief (Oct. 07, 2002)Original Image of this Document (PDF)

• 02-55418 (Docket)

(Mar. 14, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.